1998-NMCA-134

965 P.2d 370

The ATLIXCO COALITION, The Center for Holistic Management, Shannon Horst, and Dwight and Joanna Hendrichsen, Appellants,

v.

Peter MAGGIORE, Secretary of the New Mexico Environment Department, Appellee,

and

Southwest Landfill, Inc., Intervenor–Appellee.

No. 18463.

Court of Appeals of New Mexico.

Sept. 4, 1998.

788

Douglas Meiklejohn, Douglas Wolf, New Mexico Environmental Law Center, Santa Fe, for Appellants.

Ana Marie Ortiz, Special Assistant Attorney General, Assistant General Counsel, New Mexico Environment Department, Santa Fe, for Appellee.

Gwenellen P. Janov, Williams, Janov & Cooney, P.C., Albuquerque, for Intervenor–Appellee.

## OPINION

ARMIJO, Judge.

{1} The Atlixco Coalition and four of its members (Atlixco) bring this direct appeal under NMSA 1978, Section 74-9-30 (1990), to challenge the final order issued by the Secretary of the New Mexico Environment Department (Secretary) approving a solid waste facility permit for a landfill owned by Southwest Landfill, Inc. (Southwest) that is located approximately eleven miles southwest of central Albuquerque. In this appeal, Atlixco challenges the provisions in the Secretary's final order regarding: (1) design of the liner between Cells 3 and 4 of the landfill; (2) groundwater monitoring beneath the landfill; (3) siting of an existing portion of the landfill within 50 feet of the property boundary; (4) design of the cover that will be placed over the landfill when it is closed; and (5) financial assurance that Southwest will be able to pay for an adequate cover for the landfill when it is closed. We review the Secretary's final order to determine whether it is arbitrary, capricious, an abuse of discretion, not supported by substantial evidence in the record, or otherwise not in accordance with law. Section 74-9-30.

{2} We affirm the order with respect to the landfill's proximity to the property boundary, the alternative cover design, and the financial assurance requirements. However, because the Secretary has failed to adequately state the reasons for rejecting the proposed permit conditions regarding the additional groundwater monitoring well and the liner between Cells 3 and 4, we set aside the provisions of the final order which concern those proposed permit conditions and remand for more reasoned decisionmaking.

We leave the remaining provisions of the order in place.

## I. LINER DESIGN AND GROUNDWATER MONITORING

### A. *Background*

{3} Southwest has operated a landfill at the site since 1988. The landfill is divided into "cells," which the Department's solid waste regulations define as "confined area[s] engineered for the disposal of solid waste." 20 NMAC 9.1.I.105(K) (Nov. 30, 1995).[1] The layout of the landfill resembles that of a football field, but instead of yard lines across the field, there are five-foot berms dividing the landfill cells from one another. Also, the landfill is much larger than a football field; it will measure 120 acres in size if completed. The individual cells are filled with waste to a depth of approximately 100 feet, and they range from approximately six to twelve acres in size. Southwest estimates that it will take approximately eighteen years to fill the entire landfill site to capacity.

{4} When a cell reaches capacity, Southwest stops depositing waste in that cell and begins depositing waste in a new cell adjacent to the old one. Southwest compares its disposal of waste in a cell to the way bricks. are laid when constructing a brick wall, except the wall consisting of these "bricks" of waste is built at an angle instead of upright. Southwest has deposited waste in three cells numbered 1, 2, and 3, and plans to construct additional cells numbered 4 through 8.

{5} Southwest's landfill may accept only the categories of solid waste which it is engineered to hold. For the most part, Southwest accepted only construction and demolition debris for disposal in Cells 1, 2, and 3. The Solid Waste Act defines "construction and demolition debris" as "materials generally considered to be not water soluble and nonhazardous in nature" such as steel, glass, brick, concrete, lumber, rocks, and soil. NMSA 1978, § 74–9–3(D) (1990); *see also* 20 NMAC 9.1.I.105(T). However, if construction and demolition debris is mixed with any

other type of waste, then it loses this classification. *See* § 74–9–3(D); 20 NMAC 9.1.I.105(T). Also, if a landfill receives more than 25 tons per day of construction and demolition waste, then it loses its status as a "construction and demolition landfill" and becomes a "municipal landfill." 20 NMAC 9.1.I.105(AM)(2). At some point, Southwest began accepting more than 25 tons per day of construction and demolition debris.

{6} Southwest applied for a permit to operate a municipal landfill on September 25, 1995, and amended its application on July 29, 1996. In its application, Southwest proposed to deposit municipal solid waste, in addition to construction and demolition waste, in Cells 4 through 8. As defined in the Department's regulations, a "municipal landfill" may not accept hazardous waste that is regulated under Subtitle C of the Resource Conservation and Recovery Act (RCRA), 42 U.S.C. §§ 6921 to 6939e (1994), but it may accept household waste and other waste regulated under Subtitle D of RCRA. 42 U.S.C. §§ 6941 to 6949a (1994); 20 NMAC 9.1.I.105(AM)(1). Household waste and RCRA Subtitle D waste may include some non-hazardous, water-soluble contaminants. 20 NMAC 9.1.I.105(AI).

{7} For this reason, the Department's design criteria for municipal landfills are different than the criteria for construction and demolition landfills. One of the structural components required for a municipal landfill is a liner, which the Department's regulations define as a "continuous layer constructed of natural or man-made materials beneath and on the sides of a surface impoundment, landfill, or landfill cell, that restricts the downward and lateral movement of solid waste, gases or leachate." 20 NMAC 9.1.I.105(AQ). "Leachate" is further defined as "liquid that has passed through or emerged from solid waste." 20 NMAC 9.1.I.105(AO).

{8} There is no liner beneath Cells 1, 2, and 3, and the parties do not contend that those cells are required to have a liner in order to contain the construction and demoli-

---

1. For ease of reference, this opinion cites the Department's regulations in the form they appear in the New Mexico Administrative Code as amended through November 30, 1995, unless otherwise noted.

tion debris which they presently hold. However, in its permit application, Southwest proposes to construct a liner beneath Cells 4 through 8 in order to allow for the disposal of municipal solid waste in those cells. Southwest does not propose to retrofit Cells 1, 2, or 3 with liners, nor does it propose to extend the liner beneath Cell 4 so that it would completely cover the side of Cell 4 that abuts Cell 3. Instead, Southwest proposes to extend the disposal of construction and demolition debris into Cell 4 at an angle which, according to its expert's testimony, would be sufficient to restrict the lateral and downward migration of leachate so that it could not reach the adjacent, unlined cells and percolate into the groundwater beneath the landfill.

{9} Pursuant to NMSA 1978, Sections 74–9–23(B) and 74–9–29 (1990), the Department scheduled a formal adjudicatory hearing on Southwest's permit application and appointed a hearing officer to preside at the hearing and issue a report to the Secretary. The hearing officer granted Atlixco's motion to intervene as a party. At the hearing, Atlixco's expert testified that the design proposed by Southwest was not sufficient to contain the lateral and downward migration of the leachate into Cell 3 and the groundwater beneath it. In its answer brief, Southwest acknowledged that the five-foot berm between the cells would be flattened or removed when waste is deposited in the new cell. For these reasons, Atlixco proposes adding a permit condition requiring Southwest to extend the liner beneath Cell 4 so that it completely covers the side of Cell 4 that abuts Cell 3.

{10} The Department's regulations also require a permit applicant to identify and characterize the groundwater beneath the proposed landfill site and to construct a groundwater monitoring system to determine the effect, if any, that the landfill is having on groundwater quality. 20 NMAC 9.1.II.202(A)(7)(a); 20 NMAC 9.1.VIII.802. The parties presented conflicting evidence regarding the gradient or flow direction of the groundwater beneath Southwest's landfill. Atlixco proposes adding a permit condition that would require Southwest to install an additional monitoring well on the east side of the landfill so that any groundwater flowing in that direction can be monitored.

{11} After hearing the testimony of the experts for each side, the hearing officer essentially agreed with Atlixco regarding the need for an additional monitoring well and a liner between Cells 3 and 4. The hearing officer's report includes, in relevant part, the following recommended findings of fact relating to the liner between the two cells and the groundwater beneath the site:

88. Cell 3 of the Landfill is an unlined cell for construction and demolition debris waste.

89. Cell 4 is a lined cell that will receive municipal solid waste.

90. The Application proposes a boundary between cell 3 and cell 4 that does not include a liner except on a berm at the base of the boundary.

91. Although the boundary between cells 3 and 4 is a total of between 95 and 108 feet, the berm is only five feet high.

92. Moisture can travel laterally within a cell, particularly if it encounters a relatively impermeable material in a horizontal direction.

93. Both municipal solid waste and construction and demolition debris waste include relatively impermeable materials, and Southwest places waste in the Landfill in horizontal layers.

94. Although the intrusion of construction and demolition debris waste into cell 4 probably will make it less likely that moisture that has been in contact with municipal solid waste will move into cell 3, that still is possible.

95. [The Department] would not approve a liner of construction and demolition debris waste at the other end of cell 4.

. . . .

98. The formation in which the landfill is located is part of the Santa Fe formation.

99. Laval Green testified that the Santa Fe formation includes some very clayey lenses which could lead leachate to move horizontally rather than vertically, thereby causing a stepping stone effect that would

move away from the landfill before it reaches the screening of the ground water monitoring wells.

100. There is no specific evidence of the existence of clayey lenses or other geologic features beneath the Landfill site that would provide conduits for lateral transport of leachate away from the site.

101. Southwest has not demonstrated that the ground water gradient is to the west-southwest as is alleged in the Application.

{12} In the "recommended decision" portion of the hearing officer's report, the hearing officer recommended adding several conditions to Southwest's permit that were proposed by Atlixco. One of these permit conditions would require Southwest to "design and construct a liner between cells 3 and 4 prior to the acceptance of any municipal solid waste into cell 4." Another permit condition would require Southwest to "design and construct an additional monitoring well on the east side of the Landfill between the Landfill and the Rio Grande." The hearing officer's report also recommends adopting a conclusion of law that: "Subject to the conditions set forth in the Recommended Decision portion of this Report and Recommendation, the Application complies with all applicable requirements of the [Solid Waste] Act and 20 NMAC 9.1."

{13} In his final order granting Southwest's application for a permit, the Secretary adopted this conclusion of law recommended by the hearing officer, but did not adopt all of the recommended findings and permit conditions upon which it was premised. The permit conditions in the Secretary's final order do not require the construction of a liner between Cells 3 and 4, nor do they require an additional monitoring well on the east side of the landfill. The Secretary's final order deletes all of the hearing officer's recommended findings that were quoted above except for Paragraph 101, which the Secretary modified by deleting the word "not" so that it reads: "Southwest has demonstrated that the ground water gradient is to the west-southwest as is alleged in the Application." However, the Secretary did not add alternative findings of fact to the final order in place

of those he deleted from the hearing officer's recommendations, nor did he include a new conclusion of law in the final order which affirmatively states that Southwest's application complies with the Solid Waste Act and the Department's regulations without the recommended permit conditions regarding the liner between Cells 3 and 4 and the additional monitoring well.

**B. *Discussion***

{14} With respect to groundwater monitoring and the liner between Cells 3 and 4, Atlixco contends that the Secretary's final order is arbitrary and capricious because it fails to state the basis for his ruling and the reasoning used to arrive at the ruling. In particular, Atlixco asserts that the final order does not state any reasons why the Secretary deleted the hearing officer's findings and recommendations, and with these deletions, the final order does not provide sufficient support for its rejection of Atlixco's proposed permit conditions. As such, Atlixco argues that the Secretary's final order violates both the Solid Waste Act and the Department's own regulations.

{15} The Solid Waste Act requires that the Secretary's final order following an adjudicatory hearing "shall state the reasons for the action." NMSA 1978, § 74-9-29(B)(1) (1990). The Department's regulations governing its permit procedures state that "[t]he Secretary may adopt, modify, or set aside the Hearing Officer's recommended decision, and shall set forth in the final order the reasons for the action taken." 20 NMAC 1.4.V.504(B) (Dec. 1, 1997). The Department is required to act in accordance with its own regulations. *See New Mexico State Racing Comm'n v. Yoakum*, 113 N.M. 561, 564, 829 P.2d 7, 10 (Ct.App.1991). Further, both the Department's solid waste regulations and its permit procedure regulations are to be liberally construed to carry out their purposes and the purposes of the Solid Waste Act. 20 NMAC 1.4.I.109 (Dec. 1, 1997); 20 NMAC 9.1.X.1006.

■ {16} The Department contends that the Secretary need not state any reasons for the decision to depart from the hearing offi-

cer's report and recommendations because the Secretary's decision to make such departures is discretionary. This argument confuses the question of whether the Secretary's action requires a statement of reasons with the question of whether such action is subject to judicial review. Some types of discretionary acts are not judicially reviewable. *See* 5 U.S.C. § 701(a)(2) (1994) (providing exception to right of judicial review when federal "agency action is committed to agency discretion by law"); *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971) (interpreting this exception as applicable only in rare instances where there is no law to apply); *Ross v. State Racing Comm'n*, 64 N.M. 478, 483, 330 P.2d 701, 704 (1958) (court has no power to review reasonably exercised administrative discretion). An action which is unreviewable requires no explanation. *See Lalani v. Perryman*, 105 F.3d 334, 338 (7th Cir. 1997).

■ {17} However, in this case the Solid Waste Act and the Department's regulations explicitly state that the Secretary's actions are subject to judicial review and that they require a statement of reasons. *See* §§ 74–9–29(B)(1), 74–9–30; 20 NMAC 1.4.V.504 (Dec. 1, 1997). Indeed, one of the purposes of requiring a statement of reasons is to allow for meaningful judicial review. *See Green v. New Mexico Human Servs. Dep't*, 107 N.M. 628, 631, 762 P.2d 915, 918 (Ct.App. 1988) (compliance with statute requiring agency to state reasons for its decision is "necessary for meaningful appellate review"); *Akel v. New Mexico Human Servs. Dep't*, 106 N.M. 741, 743, 749 P.2d 1120, 1122 (Ct. App.1987) (requiring agency's decision to "adequately reflect the basis for [its] determination and the reasoning used in arriving at such determination . . . so that this court may adequately perform its appellate review.").

{18} Southwest and the Department attempt to distinguish *Green* and *Akel* on the grounds that *Akel* did not involve an agency's departure from a hearing officer's recommendations and *Green* involved a total failure to explain how the agency was treating the hearing officer's recommendations rather than just a failure to explain why the agency was rejecting such recommendations. Southwest also suggests that the hearing officer's recommendations are like the proposed findings that a party submits to a trial court which an appellate court will presume to be rejected if the trial court does not expressly adopt them. *See Empire W. Cos. v. Albuquerque Testing Labs., Inc.*, 110 N.M. 790, 794–95, 800 P.2d 725, 729–30 (1990).

■ {19} We do not agree that *Green* and *Akel* are distinguishable, nor do we accept Southwest's analogy between the standard for reviewing the Secretary's order and the standard for reviewing the findings and conclusions of a trial court. *Green* and *Akel* may be understood as applications of the general principle that in a formal, adjudicatory proceeding the decisionmaker must rule on the material issues in dispute in a manner that is sufficient to permit meaningful appellate review. *Cf. Padilla v. Real Estate Comm'n*, 106 N.M. 96, 98, 739 P.2d 965, 967 (1987) (findings which wholly fail to resolve in any meaningful way the basic issues of fact in dispute are insufficient to permit reviewing court to decide the case at all, except to remand it for proper findings); *Green v. General Accident Ins. Co.*, 106 N.M. 523, 527, 746 P.2d 152, 156 (1987) (in selectively refusing and adopting by number reference both parties' requested findings without drafting its own, trial court failed to make findings sufficient for appellate court to review). In an administrative context where the Legislature has expressly required the Secretary to state the reasoning behind his decision, *see* § 74–9–29(B)(1); 20 NMAC 1.4.V.504(B) (Dec. 1, 1997), this principle may apply with additional force, *see Viking Petroleum, Inc. v. Oil Conservation Comm'n*, 100 N.M. 451, 453, 672 P.2d 280, 282 (1983) (findings by expert administrative commission must disclose the reasoning on which its order is based); *Fasken v. Oil Conservation Comm'n*, 87 N.M. 292, 294, 532 P.2d 588, 590 (1975) (same). We also find principles of federal administrative law to be persuasive in this context.

{20} When the Legislature specifically directs the Secretary to state the reasons for an administrative action, the reviewing court

"may not supply a reasoned basis for the agency's action that the agency itself has not given." *Motor Vehicle Mfrs. Ass'n. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983); *see also Bowen v. American Hosp. Ass'n,* 476 U.S. 610, 626, 106 S.Ct. 2101, 90 L.Ed.2d 584 (1986) (plurality opinion) (court will not uphold administrative action simply because it is possible to conceive a basis for it). For the court to supply reasons for the Secretary in this manner is not consistent with the doctrine of separation of powers because it "foists upon the court what is essentially the function of the Executive Branch of government." *McGonigel's, Inc. v. Pennsylvania Liquor Control Bd.,* 663 A.2d 890, 893 (Pa. Commw.Ct.1995). *See generally* Sidney A. Shapiro & Richard E. Levy, *Heightened Scrutiny of the Fourth Branch: Separation of Powers and the Requirement of Adequate Reasons for Agency Decisions,* 1987 Duke L.J. 387, 428.

■ {21} In this context, the task of supplying reasons for its actions is a function of the Executive Branch because it involves matters that are within the Secretary's specialized field of expertise. *Cf. Chavez v. Mountain States Constructors,* 1996–NMSC–070, ¶¶ 19, 20, 122 N.M. 579, 929 P.2d 971 (when reviewing administrative agency decisions, courts consider whether matter is within agency's specialized field of expertise). Thus, unlike the review of a trial court's decision in which separation-of-powers principles and agency expertise are not implicated, the Secretary's final order "cannot be sustained on a ground appearing in the record to which the [Secretary] made no reference; to the contrary, the [Secretary's] decision stands or falls on its express findings and reasoning." *NLRB v. Indianapolis Mack Sales & Serv., Inc.,* 802 F.2d 280, 285 (7th Cir.1986).

{22} Further, under the Solid Waste Act and the Department's permit procedures, the hearing officer is not an interested party who submits proposed findings to a trial court but rather an impartial official who presides at a formal, adjudicatory hearing, where he or she is in a position to assess the credibility of witnesses and rule on evidentiary motions.

*See* § 74–9–29(A)(7); 20 NMAC 1.4.I.112 (Dec. 1, 1997) (powers, duties, and qualifications of hearing officer). Under these circumstances, the hearing officer's report and recommendations are "a relevant and important part of the administrative record." *In re Appeal of Dell,* 140 N.H. 484, 668 A.2d 1024, 1032 (N.H.1995); *see also Board of Sch. Comm'rs v. James,* 96 Md.App. 401, 625 A.2d 361, 380 n. 11 (Md.Ct.App.1993).

■ {23} As such, the whole-record standard of review that applies to administrative actions does not permit the reviewing court to ignore the hearing officer's report and recommendations if they are contrary to the Secretary's decision. *See Duke City Lumber Co. v. New Mexico Envtl. Improvement Bd.,* 101 N.M. 291, 294, 681 P.2d 717, 720 (1984) ("[T]he substantial evidence rule must be applied to the *entire record* and ... segments of the record may not be ignored in applying the rule.") (emphasis added); *Trujillo v. Employment Sec. Dep't.,* 105 N.M. 467, 470, 734 P.2d 245, 248 (Ct.App.1987) (same). This is particularly true with regard to issues of witness credibility. *See Harberson v. NLRB,* 810 F.2d 977, 984 (10th Cir. 1987); *Penasquitos Village, Inc. v. NLRB,* 565 F.2d 1074, 1076 (9th Cir.1977).

■ {24} Finally, we interpret the standard of review under Section 74–9–30 as embodying the principle of federal administrative law that an agency's action is arbitrary and capricious if it provides no rational connection between the facts found and the choices made, or entirely omits consideration of relevant factors or important aspects of the problem at hand. *Motor Vehicle Mfrs. Ass'n.,* 463 U.S. at 43, 103 S.Ct. 2856. To meet this standard, the Secretary may not disregard those facts or issues that prove difficult or inconvenient or refuse to come to grips with the result to which those facts or issues lead, *see Sea Robin Pipeline Co. v. F.E.R.C.,* 127 F.3d 365, 370 (5th Cir.1997), nor may the Secretary select and discuss only that evidence which favors his ultimate conclusion or fail to consider an entire line of evidence to the contrary, *see Herron v. Shalala,* 19 F.3d 329, 333 (7th Cir.1994). Allowing the Secretary to ignore material issues raised by the parties in this manner would

render their right to be heard illusory. *See Tenneco Gas v. F.E.R.C.*, 969 F.2d 1187, 1214 (D.C.Cir.1992).

■ {25} For these reasons, we interpret Section 74–9–29(B)(1) and 20 NMAC 1.4.V.504(B) as encompassing the requirement that the Secretary provide a reasoned explanation for why he departed from the recommendations of the hearing officer who presided at the formal adjudicatory hearing and heard the testimony of the witnesses. While we express no opinion about whether the same requirement applies under other statutory schemes or in the absence of a statute, we note that several courts in other jurisdictions have required this type of explanation when interpreting similar statutory schemes. *See, e.g., Harberson*, 810 F.2d at 984; *Steen v. North Dakota Dep't of Human Servs.*, 562 N.W.2d 83, 86 (N.D.1997); *In re Appeal of Dell*, 668 A.2d at 1032; *McGonigel's, Inc.*, 663 A.2d at 892–93; *James*, 625 A.2d at 380 n. 11; *Weiner v. Board of Registration of Psychologists*, 416 Mass. 675, 624 N.E.2d 955, 958 (Mass.1993). *See generally* 2 Am.Jur.2d *Administrative Law* § 374 (1994); 3 Kenneth C. Davis, *Administrative Law* § 17.16 (2d ed.1980).

■ {26} In this case, the potential migration of contaminants from Cell 4 to Cell 3 and the groundwater beneath the site, as well as the gradient or flow direction of the groundwater, are important aspects of the environmental protection problem that the permitting process is required to address. The hearing officer's recommendations are relevant factors in addressing these aspects of the problem. However, the Secretary's final order lacks findings or conclusions which adequately address these aspects of the problem or the permit conditions that the hearing officer recommended to solve them. Therefore, we set aside the provisions of the Secretary's final order which delete or modify the hearing officer's recommended findings and permit conditions regarding the additional monitoring well and the liner between Cells 3 and 4, and we remand so the Secretary may reconsider and explain the reason for his deviation from the Hearing Officer's recommendations on these issues. *See* § 74–9–30(B)(1) (court shall set

aside administrative action if it is found to be arbitrary and capricious).

{27} On remand, the Secretary may supply additional findings and conclusions based on the existing record to support his decision to accept, reject, or modify the recommended permit conditions regarding the additional monitoring well and the liner between Cells 3 and 4, or he may reconsider whether to add such conditions to the permit after hearing additional evidence from the parties. The Secretary shall complete such action in a timely manner consistent with NMSA 1978, Sections 74–9–23(B) and 74–9–24(A) (1990).

■ {28} Because it would be unnecessarily disruptive to set aside the Secretary's final order in its entirety, and there is no doubt that the Secretary would have granted the permit subject to the existing conditions in the final order even if he had also adopted the hearing officer's recommendations regarding the additional monitoring well and the liner between Cells 3 and 4, we leave in place the provisions of the order which do not concern these recommendations. *See Davis County Solid Waste Mgt. and Energy Recovery Special Serv. Dist. v. EPA*, 108 F.3d 1454, 1459 (D.C.Cir.1997) (per curiam); *cf.* Kenneth Culp Davis & Richard J. Pierce, Jr., *Administrative Law Treatise* § 7.4, at 320 (3d ed.1994) (listing factors to guide court's discretion in deciding whether to vacate agency action); ABA House of Delegates Res. No. 107B (Annual Mtg., Aug. 5–6, 1997) <http://www.a banet.org/leadership/recommend/107B.html> (same).

## II. PROXIMITY OF LANDFILL TO PROPERTY BOUNDARY

■ {29} The Department's regulations set forth siting criteria for municipal landfills, including a requirement that such landfills shall not be located within 50 feet from the property boundaries. *See* 20 NMAC 9.1.III.302(A)(9). In this case, there is no dispute that Cells 1 and 2 of Southwest's landfill are closer than 50 feet from the property boundary. However, Southwest and the Department contend that approving Southwest's permit application does not violate the Department's siting criteria because, as stat-

ed in the findings of fact adopted by the Secretary, Cells 1 and 2 "were constructed, filled, and closed prior to the adoption of the current regulations."

■ {30} The question on appeal is whether the Secretary was correct in interpreting the Department's regulations as not applying to Cells 1 and 2. This is a question of law to which the Court affords de novo review. *See Cox v. Municipal Boundary Comm'n,* 120 N.M. 703, 705, 905 P.2d 741, 743 (Ct.App.1995). However, in resolving ambiguities in the statute or regulations which an agency is charged with administering, the Court generally will defer to the agency's interpretation if it implicates agency expertise. *See Chavez,* 1996–NMSC–070, ¶ 21, 122 N.M. 579, 929 P.2d 971. The regulations at issue here expressly state that they are to be construed liberally to carry out the purposes of the Solid Waste Act. *See* 20 NMAC 9.1.X.1006.

{31} One of the purposes of the Solid Waste Act is to "plan for and regulate, in the most economically feasible, cost-effective and environmentally safe manner, the reduction, storage, collection, transportation, separation, processing, recycling and disposal of solid waste." NMSA 1978, § 74–9–2(D) (1990). One of the Department's experts testified that the purpose of the property-boundary requirement is "to ensure that proper drainage and closure of the landfill can be maintained." [Tr. 521–22]

{32} The Department provides two reasons why these purposes would not be served by holding Southwest in violation of the Department's siting criteria based on the fact that Cells 1 and 2 are within 50 feet of the property boundary. First, the Department's expert testified that Southwest "will have proper drainage and closure around this landfill" despite the proximity of Cells 1 and 2 to the property boundary. Second, the effect of holding Southwest in violation of this requirement would be to require the excavation and removal of the waste that is too close to the property boundary. The Department presented evidence that such an excavation would cause more environmental damage than it would remedy. Thus, according to the Department, the interpretation of

the regulation proposed by Atlixco would achieve an absurd result that is contrary to the statute's purpose. *See Chavez,* 1996–NMSC–070, ¶ 24, 122 N.M. 579, 929 P.2d 971 (court will avoid literal interpretation that leads to an absurd or unreasonable result).

{33} We defer to the agency's reasonable interpretation of its own regulations concerning this issue. *See Chavez,* 1996–NMSC–070, ¶ 21, 122 N.M. 579, 929 P.2d 971; *Joab, Inc. v. Espinosa,* 116 N.M. 554, 557, 865 P.2d 1198, 1201 (Ct.App.1993). We affirm the Secretary's final order with respect to the proximity of the closed Cells 1 and 2 to the property boundary.

## III. ALTERNATIVE COVER DESIGN AND FINANCIAL ASSURANCE

### A. *Background*

{34} The Department's regulations establish design criteria for the cover which is to be placed over the landfill after it is filled and no longer receiving waste. One of the purposes of these design criteria is to prevent a phenomenon known as the "bathtub effect," wherein liquid collects in the landfill cells because the cover on top of the landfill is not as "leakproof" as the liner on the bottom of the landfill. *See Revisions to Criteria for Municipal Solid Waste Landfills,* 62 Fed.Reg. 40,708, 40,710 (July 29, 1997) (discussing "bathtub effect"). To prevent this phenomenon, the regulations require there to be a certain relationship between the top cover's ability to stop liquids from passing through it and the bottom liner's ability to do the same.

{35} This requirement is spelled out in the Department's solid waste regulations as follows:

1. Owners and operators shall install a final cover system which consists of the following:

a. an infiltration layer comprised of a minimum of eighteen inches of earthen material having a saturated hydraulic conductivity less than or equal to the saturated hydraulic conductivity of any bottom liner system or natural subsoils present, or a saturated hydraulic con-

ductivity no greater than $1 \times 10^{-5}$ cm/sec. whichever is less;

b. an erosion layer consisting of a minimum of 6 inches of earthen material that is capable of sustaining native plant growth;

c. any necessary gas vents provided they are sealed to assure no water infiltration;

d. side slopes that shall not exceed a 25% grade (four feet horizontal to one foot vertical), such that the final cover of the top portion of a landfill shall have a gradient of 2% to 5%, and that the slope shall be sufficient to prevent the ponding of water and erosion of the cover material.

2. upon EPA approval of the State program in the Federal Register, the Secretary may approve an alternative final cover design that includes:

a. an infiltration layer that achieves an equivalent reduction in infiltration as the infiltration layer as specified in Section 502.A.1.a; and

b. an erosion layer that provides equivalent protection from wind and water erosion as the erosion layer specified in Section 502.A.1.b.

20 NMAC 9.1.V.502(A)(1), (2). EPA has approved the State's program in the Federal Register. *See* 59 Fed.Reg. 66,306 (Dec. 23, 1994).

{36} Southwest asserts that its alternative cover design meets the requirements of paragraph (2) of 20 NMAC 9.1.V.502(A), and therefore it need not satisfy the requirements of paragraph (1). Atlixco contends that Southwest's alternative cover design is flawed and does not meet the requirements of either paragraph (1) or paragraph (2). The Secretary adopted the following findings of fact regarding Southwest's alternative cover design:

48. Southwest submitted an alternative design for the final cover of the Landfill consisting of six inches of material with a permeability of $1 \times 10^{-4}$ cm/sec. placed over twelve inches of soil-rooting medium which, in turn, is placed over an infiltration barrier consisting of twenty-four inches of material with a permeability of $1 \times 10^{-4}$ cm/sec.

49. The Landfill also will have twelve inches of intermediate cover and six inches of daily cover.

50. The equivalency of the alternate cover design was demonstrated through the HELP model developed by EPA and NMED.

Based on these findings, the Secretary approved the permit with the alternative cover design proposed by Southwest.

{37} The Department's regulations also require Southwest to set aside money in advance to pay for closing and maintaining the landfill, including the cost of installing the landfill cover discussed above. *See* 20 NMAC 9.1.IX.902. In its application, Southwest proposed to establish a trust fund for this purpose and submitted detailed written estimates to show that the money deposited in such a fund would be sufficient to pay for the alternative cover design it proposed. *Cf.* 20 NMAC 9.1.IX.906(A) (trust fund is allowable mechanism for meeting financial assurance requirements). The Secretary ordered that the financial assurance instrument described in Southwest's permit application "shall be executed with the first annual payment deposited prior to construction of any lateral expansion."

**B.** *Discussion*

{38} The evidence in the record concerning the alternative cover design involves computer modeling and different ways of measuring how liquids flow through soil and liner materials. Atlixco contends that Southwest's computer modeling is incorrect and that the proper measurement is to compare the saturated hydraulic conductivity of the liner beneath the landfill with the saturated hydraulic conductivity of the infiltration layer which forms part of the cover for the landfill.

{39} Southwest and the Department contend that Atlixco is trying to compare apples and oranges because paragraph (1) of the regulation speaks in terms of "saturated hydraulic conductivity" while the alternative in paragraph (2) speaks in terms of "reduction in infiltration." According to Southwest and the Department, "saturated hydraulic con-

ductivity" is a measurement of permeability, while "reduction in infiltration" is a measure of percolation. In addition to saturated hydraulic conductivity, Southwest's computer modeling takes into account several other site-specific factors which are relevant to determining the reduction in infiltration that its alternative cover design is projected to achieve.

{40} With regard to this highly technical issue, we conclude that the Department may reasonably interpret its regulations as permitting Southwest to demonstrate the "reduction in infiltration" achieved by its alternative cover design through the use of a Department-approved computer model that accounts for these site-specific factors. *See Chavez*, 1996–NMSC–070, ¶ 21, 122 N.M. 579, 929 P.2d 971; *Joab, Inc. v. Espinosa*, 116 N.M. at 557, 865 P.2d at 1201. We note that the Department's regulations regarding the landfill cover design are identical to the federal regulations promulgated by the EPA on this subject. *Compare* 20 NMAC 9.1.V.502(A)(1), (2) *with* 40 C.F.R. §§ 258.60(a), (b) (1997). Although they are not binding on the Department, the comments of the EPA which accompany recent revisions to these federal regulations support Southwest's position that the alternative cover design may comply with the Department's regulations even though it does not employ an infiltration layer that is identical to the liner material used beneath the landfill. *See Revisions to Criteria for Municipal Solid Waste Landfills*, 62 Fed.Reg. at 40,710.

{41} Contrary to the contention in Atlixco's reply briefs, we do not believe the relevance of the EPA comments is limited to the subject of "flexible membrane liners." We also do not find merit in Atlixco's contention that the Department erred by measuring the reduction in infiltration produced by the cover system as a whole rather than just the infiltration layer. Rather, the site-specific nature of Southwest's computer modeling is designed to estimate the performance of the infiltration layer in the context of its surroundings.

{42} We conclude that the Department's regulations allow for the use of a site-specific, computer model to demonstrate the reduction in infiltration achieved by an alternative cover design, and the calculations in the record provide sufficient evidence to support the finding that Southwest's alternative cover is designed to achieve the equivalent reduction in infiltration required under these regulations. Therefore, we affirm the Secretary's final order with respect to the alternative cover design.

{43} Our conclusion regarding Atlixco's challenge to the alternative cover design largely disposes of the additional contention that Southwest has failed to set aside enough funds to meet the Department's financial assurance requirements for the landfill cover. There is sufficient evidence in the record to support the conclusion that Southwest has provided adequate financial assurance regarding the installation of the alternative cover discussed above. Therefore, we affirm the Secretary's final order with respect to the financial assurance requirements.

## IV. CONCLUSION

{44} For the foregoing reasons, we affirm the Secretary's final order with respect to the property boundary, the alternative cover design, and the financial assurance requirements. We set aside the provisions of the final order which concern the additional monitoring well and the liner between Cells 3 and 4. With respect to these two recommended permit conditions, we remand so the Secretary may reconsider and explain the reason for his deviation from the Hearing Officer's recommendations. We leave the remaining provisions of the final order in place.

{45} **IT IS SO ORDERED.**

APODACA and BUSTAMANTE, JJ., concur.