2003-NMCA-141

81 P.3d 580

**In the Matter of the Application of Rhino Environmental Services, Petitioner for a Solid Waste Landfill Permit for the Rhino Solid Waste Facility.**

**COLONIAS DEVELOPMENT COUNCIL, Appellant,**

v.

**RHINO ENVIRONMENTAL SERVICES, INC. and the New Mexico Environment Department, Appellees.**

No. 22,932.

Court of Appeals of New Mexico.

Oct. 3, 2003.

Certiorari Granted, No. 28,337, Dec. 2, 2003.

Nancy L. Simmons, Law Offices of Nancy L. Simmons, P.C., Albuquerque, NM, for Appellant.

Clay Clarke, Assistant General Counsel, Special Assistant Attorney General, Santa Fe, NM, for Appellee The New Mexico Environment Dept.

C. Shannon Bacon, John G. Baugh, Eaves, Bardacke, Baugh, Kierst & Kiernan, P.A., Albuquerque, NM, for Appellee Rhino Environmental Services, Inc.

### OPINION

VIGIL, Judge.

{1} The Colonias Development Council (CDC) seeks to reverse a decision of the New Mexico Environment Department (NMED or

the Department) issuing a permit to Rhino Environmental Services, Inc. (Rhino) to operate a landfill near Chaparral, New Mexico. We address CDC's claims that the Department did not comply with the Solid Waste Act, NMSA 1978, §§ 74–9–1 to –43 (1990, as amended through 2001) (the Act), and the regulations adopted pursuant to the Act, because the Department failed to consider the "social impact" of the landfill on the community of Chaparral, and failed to consider regional planning. We also address CDC's claims that it was denied due process because the hearing officer refused to grant a continuance of the public hearing, and demonstrated bias. We hold that the Department properly considered the applicable regulatory requirements, reject the other claims, and affirm.

{2} Rhino filed an application with NMED for a permit to operate a landfill near Chaparral. Section 74–9–23(B) requires the Department to hold a public hearing on the application within 60 days from the date the application is deemed complete and Section 74–9–24(A) requires the Secretary to rule on the application within 180 days after the application is deemed complete.

{3} Consistent with statutory requirements, the Department scheduled a public hearing in Chaparral that began on September 10, 2001, CDC is an interested party who opposed the application. There was strong opposition to the proposed landfill, and emotions ran high during much of the public hearing. Additionally, the terrorist attacks on September 11, 2001, (September 11th) made an already emotionally charged hearing even more difficult. The impact of the events of September 11th affected the hearing in several ways, which we discuss later in this opinion.

{4} After the hearing, the hearing officer filed a report recommending that the Secretary grant the permit. The Secretary, acting through his designee, the Director of the Water and Waste Management Division (referred to in this opinion as the Secretary), granted the permit, with conditions, for a period of 10 years. CDC appeals that decision. The Chaparral Community Health Council (CCHC) also appeared as a party but has not appealed.

## DISCUSSION

### A. Standard of review

{5} CDC appeals the order granting the permit directly to this Court under the authority of Section 74–9–30, which provides that we shall set aside the order only if it is: "(1) arbitrary, capricious, or an abuse of discretion; (2) not supported by substantial evidence in the record; or (3) otherwise not in accordance with law." *Id.* "[A]n agency's action is arbitrary and capricious if it provides no rational connection between the facts found and the choices made, or entirely omits consideration of relevant factors or important aspects of the problem at hand." *Atlixco Coalition v. Maggiore*, 1998–NMCA–134, ¶ 24, 125 N.M. 786, 965 P.2d 370. CDC's claims that the hearing officer and the Secretary failed to consider "social impact" and regional planning involve statutory interpretation. We review these claims de novo. *See Rio Grande Chapter of the Sierra Club v. N.M. Mining Comm'n*, 2003–NMSC–005, ¶ 13, 133 N.M. 97, 61 P.3d 806 (stating courts not bound by administrative agency's legal interpretation).

### B. Interpretation of the Solid Waste Act

{6} CDC recognizes that NMED's permitting procedure is "heavily, if not entirely, weighted on the technical side." The record in this case is voluminous and contains a great deal of evidence on technical issues such as impacts on groundwater, reclamation after closure, and similar topics, which CDC does not challenge on appeal. Instead, it argues that NMED did not consider regional planning or the "social impact" of the landfill on the neighboring community of Chaparral, and that the Act required NMED to do so.

#### 1. "Social Impact"

{7} CDC and certain citizens of Chaparral spoke against having a landfill near the community. Many people did not want to live near a landfill, and expressed general fears about the potential impact of a landfill on their air and water. Some felt it was unfair

to put another landfill near Chaparral when there were two or three others already nearby. One person assumed the landfill would "poison" the residents. Another theme expressed was that the landfill should be located in the desert, far from people.

{8} Sister Diana Wauters, who has a master's degree in social work, testified that having a landfill near Chaparral would have a negative collective psychic impact on the community. She said the landfill would create a perception in the community that it was a dumping ground, and it would stigmatize the community. She concluded the collective morale of the community would suffer, even if no physical harm was caused by the landfill. She urged the hearing officer to weigh "considerations of a more sociological nature."

{9} CDC argues that the foregoing "social impact" of the landfill, coupled with general community opposition to the landfill, are factors that must be considered by NMED in determining whether to grant a solid waste permit. CDC argues that NMED's failure to weigh these claimed mandatory factors invalidates the permit grant.

{10} To support its argument that a consideration of "social impact" is statutorily required, CDC relies on language in Section 74–9–2, which states that one purpose of the Act is to "enhance the beauty and quality of the environment; conserve, recover and recycle resources; and *protect the public health, safety and welfare.*" Section 74–9–2(C) (emphasis added). CDC further relies on Section 74–9–8(A)'s command that the Environmental Improvement Board shall adopt regulations to:

> A. implement, administer and enforce a program for the cost-effective and environmentally safe siting, construction, operation, maintenance, closure and post-closure care of solid waste facilities, including financial responsibility requirements for solid waste facility owners and operators also including requirements that assure that *the relative interests of the applicant, other owners of property likely to be affected and the general public will be considered*

prior to the issuance of a permit for a solid waste facility[.]

*Id.* (Emphasis added.)

{11} CDC contends that since one of the purposes of the Act is to "protect the public health, safety and welfare," Section 74–9–2(C) and Section 74–9–8(A) require consideration of the "relative interests ... of other owners of property likely to be affected and the general public" in regulations, the "social impact" of a landfill must be considered as a prerequisite to granting a landfill permit. CDC also argues that the "social well-being" of the public also provides a basis to conclude that the Act required NMED to consider the social impact of the landfill on Chaparral's citizens.

■■■ {12} Our primary task in interpreting a statute is to determine legislative intent. *See Key v. Chrysler Motors Corp.*, 1996–NMSC–038, 121 N.M. 764, 768–69, 918 P.2d 350, 354–55. The plain language of the statute is the first indicator of legislative intent. *See High Ridge Hinkle Joint Venture v. Albuquerque*, 1998–NMSC–050, ¶ 5, 126 N.M. 413, 970 P.2d 599. We will not "read into a statute language that is not there, particularly if it makes sense as written." *Id.* (internal quotation marks and citation omitted).

{13} The Act never uses the phrase "social impact." The purpose section does mention the goal of protecting the "public health, safety and welfare," § 74–9–2, but this language is extremely general, and commonly used to invoke the police power of the State. *See generally State ex rel. City of Albuquerque v. Lavender*, 69 N.M. 220, 231, 365 P.2d 652, 659 (1961) (noting that police power is an inherent power of government to make laws providing for the preservation of public peace, health, and safety). We reject CDC's argument based on the purpose section of the Act. The Act never mentions "social impact." "Social well-being" is not mentioned either, and even if "social well-being" is included within the broad concept of "public health, safety and welfare," we are not convinced that the Legislature intended that NMED be required to consider the "social impact" on the neighboring community when

the Department grants or denies a landfill permit.

{14} CDC argues that regulations must provide for consideration of the "relative interests of the applicant, other owners of property likely to be affected and the general public." Section 74–9–8(A). However, this language makes no reference to "social impact" and only contains a general requirement that the regulations must balance the interests of an applicant, property owners likely to be affected, and the general public. The statute simply recites the common sense requirement that, in adopting regulations, the broad spectrum of interests of all affected parties should be considered without favoring the interests of a particular group.

{15} We are not persuaded that CDC's interpretation of the Act is correct. The broad interpretation of the Solid Waste Act urged by CDC would alter the essential task of NMED and transform it into a legislative body. If an administrative agency must weigh and determine different social and political issues like the ones here, and is asked to determine the social impact of a particular permit request, the agency is put into a role that has no standards. If, for example, NMED were required to consider, as Sister Wauters put it, "considerations of a more sociological nature," where would that approach end? What kind of sociological impacts would it consider? In determining whether to grant a landfill permit, would NMED consider whether the landfill would provide jobs for local citizens, or how many jobs it would provide? Would it consider whether the building of a landfill served a greater good, by providing for environmentally sound repositories for waste material generated by all citizens, including people who live outside of the adjacent community? Would it consider, as one member of the community stated, that a modern, environmentally sound landfill would potentially ameliorate the problem with illegal dumping of trash in the desert areas around Chaparral? Or would it consider that, without infrastructure, the community would never grow?

{16} CDC defines "social impact" in a narrow fashion that suits its own argument, but once the Pandora's box is opened, the "social

impacts" become unlimited, multifaceted, and without standards. NMED cannot reasonably be expected to weigh sociological concerns, which it has no expertise in doing. Its role is to pass judgment on the technical aspects of a solid waste site, a subject within its expertise and which it was designed to do. Broader political and sociological concerns regarding public welfare and social impact are more appropriate for consideration by local political bodies and the Legislature, not an administrative agency charged with a technical and scientific oversight function. *See State ex rel. Taylor v. Johnson*, 1998–NMSC–015, ¶¶ 21–22, 125 N.M. 343, 961 P.2d 768 (recognizing that it is the domain of the Legislature to make public policy, and that generally the Legislature, not an administrative agency, declares policy and establishes the primary standards to which the agency must conform). We conclude that the interpretation of the Act urged by CDC is unworkable and unreasonable. *See Rio Grande Chapter of the Sierra Club*, 2003–NMSC–005, ¶ 29, 133 N.M. 97, 61 P.3d 806 (rejecting a construction of the New Mexico Mining Act that would be unworkable); *Cox v. City of Albuquerque*, 53 N.M. 334, 340, 207 P.2d 1017, 1021 (1949) (stating that statutes are to be given a sensible effect).

{17} If the Legislature had intended NMED to have the expansive authority urged by CDC, we would expect the Legislature to provide a much clearer indication than the broad reference to social welfare contained in the purpose section of the Act, or the general requirement that regulations should balance the interests of applicants, owners of affected property, and the general public. If the Legislature intended NMED to be akin to a political body, and to consider broad "social impacts" in the Department's permitting scheme, it would have clearly expressed that requirement. See *Romero v. Valencia County*, 2003–NMCA–019, ¶ 5, 133 N.M. 214, 62 P.3d 305 (noting that the Legislature knew how to fashion an exception to sovereign immunity if it had wanted to do so). Without any clearer indication than the broad references relied on by CDC, we decline to read into the Act language that

would create such expansive authority for NMED.

{18} CDC also relies on our language in *Martinez v. Maggiore,* 2003–NMCA–043, ¶ 19, 133 N.M. 472, 64 P.3d 499, in which we stated that "absent opponents of the Landfill share an important interest in insuring that modifications to [a][l]andfill[ ] permit do not adversely affect the quality of life in [an adjacent community]," to argue that NMED must consider social impact. We disagree that our reference to "quality of life" means that NMED must consider social impact as an independent criteria for granting or denying a landfill permit. Martinez addressed whether public notice was adequate, not the issue presented here. Our broad statement in Martinez is consistent with a general recognition that compliance with sound technical requirements serves the public's interest in a safe environment, and was not intended to inject broad sociological concerns into the determination whether to grant a landfill permit.

{19} CDC also complains that the hearing officer excluded and discouraged testimony concerning the landfill's impact on the social well-being of Chaparral. As we have stated, general fear and evidence about a perceived negative psychological impact, which fall within CDC's definition of "social impact," are not reasons to deny a permit that otherwise meets technical and legal requirements. *See Cooper v. Curry,* 92 N.M. 417, 420–21, 589 P.2d 201, 204–05 (Ct.App. 1978) (holding that it is not error to preclude questioning or evidence that is irrelevant). The hearing officer had discretion to exclude irrelevant evidence. *See Peterson Props. v. Valencia County Valuation Protests Bd.,* 89 N.M. 239, 242, 549 P.2d 1074, 1077 (Ct.App.1976) (holding that taxpayer was not denied due process where irrelevant evidence was properly excluded). On the other hand, the hearing officer allowed many hours of public comment, late into the night, in which many members of the community were allowed to express their opposition to a landfill being located near them. Moreover, it also appears that the hearing officer let every person who wanted to comment do so, and summarized every person's testimony in her report to the Secretary. Even if the hearing officer curtailed some evidence on these issues, our review of the record persuades us that CDC had a sufficient opportunity to present its evidence and arguments, and we see no prejudice from the rulings of the hearing officer. *See State v. Marquez,* 1998–NMCA–010, ¶ 24, 124 N.M. 409, 951 P.2d 1070 (stating that the trial court may exclude cumulative evidence).

{20} CDC argues that if we do not adopt its construction of the Act, public comment is meaningless. We disagree. Here, for example, the permit contained 20 conditions, some of which may have been a direct result of the community's concerns. Moreover, since the hearing officer summarized the testimony of every member of the public who testified, the Secretary was able to review the testimony, and to consider the complete context of the hearing, in reaching his ultimate decision. Additionally, opponents may always present technical evidence on whether the application meets the regulatory requirements, as CDC did here through its expert, Paul Robinson.

{21} We hold that the hearing officer was correct in her conclusion that CDC's expression of the social impact on Chaparral, and Chaparral's opposition to the landfill because of general concerns, did not require denying Rhino its permit.

## 2. Regional Planning

{22} CDC argues that NMED was required to consider "regionalization," which is whether there was a "regional need for a landfill." NMED's position is that it does not site landfills, but leaves it to applicants to choose a location. NMED considers the requested site only in terms of whether it meets the thirteen siting criteria contained in 20 NMAC 9.1.III.302.A (1995) (recompiled at 20 NMAC 9.1.300 (2001)). These criteria include requirements, for example, that a landfill may not be located in a flood plain, within 500 feet of a wetland, within 200 feet of a watercourse, within 1000 feet of a well, within 500 feet of a residence, or within 10 miles of an airport. They also involve factors such as the depth to water, geological stability, archeological issues, and whether threatened or endangered species habitat will be

affected. The location of the landfill satisfied all regulatory siting criteria.

{23} CDC's assertion that NMED must consider regional planning in granting a landfill permit is based on several steps of reasoning. The Act requires NMED to prepare a solid waste management plan by December 31, 1992, and to implement a solid waste management program by July 1, 1994. Sections 74-9-4, -5, and -12. The Department is also required to publish annual reports. Section 74-9-13. Since any action taken by the director of the Environmental Improvement Division must be consistent with the plan, since the plan includes as one of its purposes to "[e]ncourage the coordination of regional approaches for solid waste management within a solid waste district," and since annual reports of the Department express NMED's "policy" of regional planning, CDC concludes that NMED must consider regional planning in granting a landfill permit.

{24} We will not impose an unexpressed permit requirement of regional planning based on a purpose section contained in the plan. Nor will we do so based on an annual report. The fact that the Department's plan states a purpose or a policy of encouraging regional planning is a slim reed on which to impose a permitting requirement, not required by the statute, and we will not do so. *See Romero*, 2003-NMCA-019, ¶ 5, 133 N.M. 214, 62 P.3d 305 (noting that if the Legislature intends a specific outcome, it knows how to clearly indicate it).

{25} CDC also relies on a regulation about a grant program administered by the Environmental Improvement Division. Under the Act, the division is required to set up a grant program, which makes grants to counties and municipalities, to establish or modify solid waste facilities. *See* §§ 74-9-40 and -41. These sections say nothing about regional planning. However, one regulation adopted pursuant to these sections encourages regional planning, stating that a county or municipality can receive a higher score toward obtaining a grant if "an application is jointly made by more than one municipality or county. The greater the regionalization effort the higher the score." 20 NMAC 9.3.300(B)(2)(i) (recompiled 20 NMAC 9.3.III.300-III.301 (2001)). We reject CDC's argument that a regulation adopted pursuant to a grant program equates to a statutory permit requirement.

{26} For these reasons, and based on the arguments presented, we hold that NMED need not consider regional planning in determining whether to grant a permit.

## C. Continuance

■ {27} The public hearing in Chaparral commenced on September 10, 2001. CDC argues the hearing should have been continued for two reasons. First, it argues that the tragic events of September 11th required a continuance. Second, it argues that the hearing should have been continued to allow an expert, Paul Robinson, to attend the hearing.

{28} On the morning of September 11th, our country experienced the worst terrorist attack in our history, resulting in the destruction of the World Trade Towers and extraordinary loss of life. We well recall the difficulties of that day, and the disruption to the fabric of our national life over the ensuing days and weeks. At the request of CDC and CCHC, the hearing officer recessed the hearing on the afternoon of September 11th. The hearing officer made no decision at that time about whether to resume the following day. Counsel for CDC told the hearing officer that she would be returning to Albuquerque to be with her elderly mother and daughter, no matter what the hearing officer decided to do, and that she would not be returning. CDC urged the hearing officer to call off the remainder of the hearing. Counsel for CCHC stated that CCHC refused to participate in the hearing.

{29} On September 12, 2001, at approximately 2:00 p.m., the hearing officer decided to resume the hearings because the Governor had urged business to continue as usual, and other state agencies and offices were open. Later in the week, the hearing officer reiterated her position that "so long as the State of New Mexico is doing business, we're going to be doing business, as well." Counsel for CCHC continued to press for a continuance,

arguing that attendance was poor, compared to the first day of the hearing, and that its expert, Mr. Robinson, was traveling and unavailable at that time due to the events. Counsel for NMED responded that usually members of the public would attend the hearings in the evening, and that it was not unusual for attendance to be lower during the work day.

{30} Given the difficulties presented by the events of September 11th, we believe either course open to the hearing officer would have been a reasonable choice. She could have ordered a continuance, but the circumstances did not require her to do so. CCHC argued that the public's right to be heard was compromised by proceeding because people were afraid to attend a public hearing. The record belies that assertion, showing extensive public comment and questioning until very late on September 12, 13, and 14, 2001, and further public comment on Saturday, September 15. Nor do we believe resolution of this issue depends on the insoluble question whether the victims of the attack would have been better honored by a recess, as argued by CDC, or by continuing with life as normally as possible.

{31} The applicable regulation provides for a continuance for good cause after consideration of prejudice to the other parties and undue delay to the proceeding. 20 NMAC 1.4.200(C)(3) (1997) (recompiled 20 NMAC 1.4I.201 through 205 (2001)). We review the hearing officer's decision for an abuse of discretion. *Cf. Jaycox v. Ekeson*, 115 N.M. 635, 638, 857 P.2d 35, 38 (1993) (stating that we review the denial of a continuance for an abuse of discretion). An abuse of discretion occurs when the decision is contrary to logic and reason. *See id.*

Whether to resume the hearing on September 12, 2001, presented a difficult question, and when other state agencies were attempting to proceed with business as usual, we hold that no abuse of discretion was committed. Proceeding with the hearing was not contrary to logic and reason.

{32} CDC also argues that the hearing officer should have granted a continuance to allow CCHC's expert witness, Paul Robin-son, to attend the hearing. On August 3, 2001, CCHC moved for a continuance stating that Mr. Robinson would be traveling in Russia from August 24, 2001, until September 12, 2001. It does not appear that CCHC ever explained why Mr. Robinson was going to be in Russia, or why he would not cancel or alter his travel plans. The hearing officer denied the motion, reasoning that CCHC had agreed to the September 10, 2001, date, and expressed her concern that the statute required the hearing to be held within 180 days of the date the amended application was deemed complete. When the attacks on September 11th resulted in disruption of commercial airline service, keeping Mr. Robinson in Russia until after September 15, 2001, CCHC argued, in its renewed motion, that Mr. Robinson's absence justified a continuance. However, CDC overlooks the fact that the hearing officer held the hearing open and Mr. Robinson was allowed to testify on September 19, 2001. *See Nat'l Council on Comp. Ins. v. N.M. State Corp. Comm'n*, 107 N.M. 278, 286, 756 P.2d 558, 566 (1988) (holding that due process rights were not violated where no prejudice was demonstrated). This argument therefore fails.

{33} To the extent CDC argues that it was prejudiced because Mr. Robinson was not present to hear the live testimony of Rhino's witnesses, we remain unpersuaded. Rhino's witnesses filed detailed summaries of their testimony in advance of the hearing and Mr. Robinson had the opportunity to review them before he testified. CDC does not argue that Rhino's technical testimony at the hearing changed significantly from the pre-filed testimony, and even if it had changed, Mr. Robinson had the opportunity to review the transcript of the hearing to ascertain the nature of Rhino's expert testimony and confer with counsel before he testified. Mr. Robinson's testimony demonstrates he had an understanding of Rhino's expert testimony before he testified.

{34} Because Mr. Robinson had advance notice of the substance of Rhino's testimony in detail, could have helped counsel prepare for cross-examination in advance of the hearing, testified at the hearing, and had the opportunity to respond to Rhino's expert tes-

timony, we hold that CDC has not demonstrated a denial of due process. *See In re Laurie R.*, 107 N.M. 529, 534, 760 P.2d 1295 (Ct.App.1988) (finding no error in court's denial of a motion for continuance where Mother was given advance notice of the issues to be tried and had a reasonable opportunity to prepare her case).

## D. Bias of the Hearing Officer

{35} CDC argues that the hearing officer's bias violated its constitutional right to due process and a fair hearing. The leading New Mexico authority, which we reiterate, is *Reid v. N.M. Bd. of Exam'rs*, 92 N.M. 414, 589 P.2d 198 (1979), which states:

At a minimum, a fair and impartial tribunal requires that the trier of fact be disinterested and free from any form of bias or predisposition regarding the outcome of the case. In addition, our system of justice requires that the appearance of complete fairness be present. The inquiry is not whether the Board members are actually biased or prejudiced, but whether, in the natural course of events, there is an indication of a possible temptation to an average man sitting as a judge to try the case with bias for or against any issue presented to him.

These principles apply to administrative proceedings as well as to trials. When government agencies adjudicate or make binding determinations which directly affect the legal rights of individuals, it is imperative that those agencies use the procedures which have traditionally been associated with the judicial process. The rigidity of the requirement that the trier be impartial and unconcerned in the result applies more strictly to an administrative adjudication where many of the customary safeguards affiliated with court proceedings have, in the interest of expedition and a supposed administrative efficiency, been relaxed.

*Id.* at 416, 589 P.2d at 200 (citations omitted). We examine each claim CDC makes that the foregoing requirements were violated.

### 1. Insistence on Decorum

{36} CDC argues that the hearing officer demonstrated bias against the community when she "initiated the hearing by warning the participants not to turn the proceedings into a rally." CDC complains that the hearing officer said, "I understand you had a rally outside, and I would ask you not to bring your outside voices into this building, or your rallying cries or your applause. Frankly, it disrupts the hearing." CDC argues that it was not a "rally," but a press conference, sponsored by the Bishop of the Diocese of Las Cruces.

{37} The hearing officer's report states that at the time she asked the public not to bring their rally inside, that is what they were trying to do. She noted that older children were climbing over her boxes and the administrative record trying to hang an anti-landfill banner behind her head so that it could be seen by television cameras that had been brought inside, that interviews with various people were being held along the sides of the gymnasium hearing room, that people were speaking loudly and excitedly, and that children were racing up and down the aisles. CDC does not challenge these findings.

{38} Moreover, the transcript reflects that immediately before the hearing officer requested that the public not bring its rally inside, she said, "it's important that we do this [hearing] in a respectful manner—that's my job, to make sure that this is a respectful proceeding and conducted calmly." Her desire to conduct the hearing in a respectful manner was expressed several times. We find nothing in these requests of the hearing officer that exhibit unconstitutional bias. *See* Rule 21–300(B)(3) NMRA 2003 (requiring judge to maintain order and decorum in judicial proceedings).

{39} CDC argues that the hearing officer made it clear "that parents with children ... were not welcome." A review of the record establishes, however, that the hearing officer was only seeking to establish decorum, because many children were screaming, crying, or disruptive. The hearing officer's insistence on decorum during the hearing did not

demonstrate unconstitutional bias against the community. Rule 21–300(B)(3).

### 2. Comments About Counsel

{40} CDC asserts that the hearing officer's bias was shown by making statements to "malign" its counsel, saying, "I have to say that I haven't really had lawyers behave the way I've witnessed on your part, either, applauding when I asked people not to applaud, laughing loudly when I did not understand a Spanish gentleman coming toward me at the public comment period, repeated threats to leave, walk out, not participate." This remark was made to counsel for CCHC, not counsel for CDC. Even if we assume that the statement to counsel for CCHC was also directed to counsel for CDC, we find no unconstitutional bias. Our review of the transcript persuades us that the hearing officer's critical comments were legitimate responses to the behavior of counsel for CCHC, do not establish unconstitutional bias against CDC, and do not require reversal. *See United Nuclear Corp. v. Gen. Atomic Co.,* 96 N.M. 155, 246–51, 629 P.2d 231, 292–97 (1980) (discussing and rejecting claims trial judge had personal bias or prejudice against party or that party had a reasonable basis to question trial judge's impartiality).

### 3. Denial of a Continuance

{41} CDC argues that the hearing officer refused to continue the hearing after the events of September 11th because she "failed to grasp the scale of tragedy." As already discussed, the hearing officer did not abuse her discretion in proceeding with the hearing, and we reject CDC's argument that the hearing officer's refusal to grant a continuance shows bias. *See State v. Turner,* 97 N.M. 575, 577–78, 642 P.2d 178, 180–81 (Ct. App.1981) (stating that denial of motions for continuance is not proof of bias).

### 4. Ex Parte Communication

{42} CDC argues that "there was an appreciable difference between the procedural courtesy granted [Rhino] and the NMED," and "clear indications" of ex parte communication between the hearing officer and NMED on procedural issues. The hearing officer acknowledged that she is an employee of the Department, and explained she is the Department Secretary's designee and that her job is to report her findings to him. In her report, she explained that in presiding over a large public hearing out of town, numerous issues arise concerning the administrative details of conducting the hearing, such as obtaining interpreting services, and providing for the physical comfort of those attending, and similar matters, which require discussion with staff. The merits of the action were not discussed in any ex parte communication.

{43} She also reminded counsel for CCHC that "I spent quite a bit more time with you and [co-counsel] privately to discuss the procedural questions you had. It was apparent to me that you had not studied our permitting procedures, and I answered a number of your questions on that point without [opposing counsel] being here." This record only shows that communications concerning scheduling and administrative matters occurred and not any communications concerning the merits of the adjudication. Therefore, there is no basis to set aside the permit grant. *See* Rule 21–300(B)(7)(a) (allowing ex parte communications for scheduling, administrative purposes or emergencies that do not deal with issues on the merits); *Singha v. N.D. Bd. of Med. Exam'rs,* 613 N.W.2d 34, 42 (N.D.2000) (same); *San Carlos Apache Tribe v. Bolton,* 194 Ariz. 68, 977 P.2d 790, 795–96 (1999) (same).

### 5. Sign-in Sheets

{44} CDC argues that the hearing officer caused confusion about sign-in sheets. However, it appears that any confusion was created by CCHC, which asked people to sign some sort of petition before they entered the hearing. Then, when the people were asked to sign the sign-in sheet, they refused, stating that they had already signed something and would not sign again. CDC has not rebutted this assertion. The hearing officer clearly explained the purpose of the sign-in sheets and, even if the hearing officer had been responsible for any confusion about a sign-in sheet, we are not persuaded that this would warrant a conclusion that she was

biased, that due process was violated, or that a new hearing should be held. *Cf. Nat'l Council on Comp. Ins.*, 107 N.M. at 286, 756 P.2d at 566 (changing format of proceedings no violation of due process where no prejudice was demonstrated).

### 6. Scheduling

 {45} CDC claims the hearing officer "demonstrated a clear lack of concern for the community," and "conducted the hearing with a view that public hearings run more smoothly without the public." CDC asserts that the hearing officer scheduled the hearing during working hours, which may have made it difficult or impossible for members of the community to attend. The record belies those assertions. The hearing officer conducted the hearings late into the night, and on Saturday, so that members of the public could present their comments. The public hearing did not end until 11:00 p.m. on September 12, and until 11:23 p.m. on September 13. On Friday, September 14, she allowed public questioning of witnesses until after midnight, and the hearing did not end until 1:50 a.m. on Saturday, September 15. Public comment was allowed during the day on Saturday as well. The hearing officer listened to every citizen who wanted to express a view.

### 7. Evidentiary Rulings

{46} CDC also asserts that the hearing officer was biased because she refused to permit members of the community to ask questions addressing the social impact of the landfill on the community. The hearing officer properly imposed limitations on the presentation of irrelevant evidence, and we find no bias from the hearing officer's correct ruling. *See Peterson Props.*, 89 N.M. at 242, 549 P.2d at 1077 (holding that irrelevant evidence was properly excluded).

{47} The hearing officer acted contrary to CDC and CCHC's wishes when she limited her consideration of certain testimony and attempted to conduct the hearing in a professional manner but these limitations and attempts to impose civility and decorum do not constitute bias, or support CDC's contention that the hearing officer "demonstrated a

clear lack of concern for the community." On the contrary, the record reflects courtesy and frequent attempts to explain the public hearing process to the public. Our review of the transcript shows that the hearing officer exercised remarkable patience during an emotionally-charged hearing, held during an already difficult week. We reject CDC's claim that the hearing officer was biased.

### CONCLUSION

{48} The decision of the Secretary granting the permit to Rhino is affirmed.

{49} **IT IS SO ORDERED.**

WE CONCUR: CYNTHIA A. FRY and IRA ROBINSON, Judges.