2005-NMSC-024

117 P.3d 939

**In the Matter of the Application of Rhino Environmental Services, Petitioner for a Solid Waste Landfill Permit for Rhino Solid Waste Facility.**

**COLONIAS DEVELOPMENT COUNCIL, Petitioner–Appellant,**

v.

**RHINO ENVIRONMENTAL SERVICES INC., and New Mexico Department of Environment, Respondents–Appellees.**

No. 28,337.

Supreme Court of New Mexico.

July 18, 2005.

Law Offices of Nancy L. Simmons, Nancy L. Simmons, Albuquerque, NM, for Petitioner.

Eaves, Bardacke, Baugh, Kierst & Larson, P.A., John G. Baugh, Susan G. Chappell, C. Shannon Bacon, Albuquerque, NM, New Mexico Environmental Department, Claybourne F. Clarke, Santa Fe, NM, for Respondents.

Roderick Ventura, Eric D. Jantz, Santa Fe, NM, for Amici Curiae New Mexico Environmental Law Center South Valley Coalition of Neighborhood Ass'ns.

Law Offices of Nancy L. Simmons, Nancy L. Simmons, Albuquerque, NM, for Amicus Curiae Diocese of Las Cruces.

## OPINION

BOSSON, Chief Justice.

{1} When the New Mexico Environment Department (Department) reviews a permit application to operate a landfill, the Department must consider public opinion at a public hearing. When the permit application is shown to comply with all technical regulations, the question arises whether the Department's review of public testimony is limited to technical issues. We hold that it is not so confined. The Department's review must include consideration of public testimony about the proposed landfill's adverse impact on a community's quality of life. The Court of Appeals having concluded otherwise, we reverse and remand to the Department for proceedings consistent with this opinion.

## BACKGROUND

{2} On September 10, 2001, more than 250 people packed the middle school cafeteria in Chaparral, New Mexico, for a public hearing. The purpose of the meeting was to review an application by Rhino Environmental Services, Inc. (Rhino) for a permit to put a landfill in Chaparral pursuant to the Solid Waste Act, NMSA 1978, §§ 74-9-1 to -43 (1990, as amended through 2001). *See* § 74-9-23(B) (requiring a public hearing on a solid waste facility permit within sixty days of a completed application). As envisioned by the Legislature, an essential goal of public hearings during the permitting process is to provide community members the opportunity to ask questions, offer their own technical evidence, cross-examine witnesses, and make nontechnical statements. *See* § 74-9-29(A)(4) (providing all persons with a reasonable opportunity to be heard); 20.1.4.300 NMAC (1997) (establishing procedures to facilitate public participation in hearings concerning permit applications).

{3} And the community did want to be heard. Even though the September 11 terrorist attack on the World Trade Center in New York City disrupted the public hearing, emptying chairs the day after the attack, more than 300 people eventually came forth between September 10 and 19, with about sixty actively testifying or conducting cross-examination. Some community members attended the sessions during the day. Others came at night, after driving home from jobs across the border in Mexico and El Paso, Texas. People brought their children and crying babies. They held press conferences. They tried to hang banners protesting the landfill. Some spoke in Spanish, through a translator provided by the Department.

{4} Although a few community members supported the landfill during the hearing, the vast majority did not. Many testified that they did not understand why another landfill had to be placed just a couple of miles from Chaparral, an unincorporated community that lacks infrastructure, political representation, and medical facilities. As a border community consisting primarily of low-income, minority residents, Chaparral has been called New Mexico's largest *colonia*.[1]

---

1. *"Colonias"* are rural settlements along the United States–Mexico border that usually consist of recent immigrants and typically lack safe housing, potable water, wastewater treatment, drainage, electricity, and paved roads. *See* Nancy L. Simmons, *Memories and Miracles—Housing the Rural Poor Along the United States–Mexico Border: A Comparative Discussion of Colonia*

{5} According to many who spoke at the hearings, Chaparral's toehold in the rural desert a stone's throw from Texas and Mexico offers sanctuary from the challenges of city life in El Paso and Juarez. And that is why citizens often made passionate appeals against the landfill. They spoke of coming to Chaparral for a better life. They spoke of wanting to breathe clean air and drink clean water. They spoke of wanting to protect the future of their children. They spoke of the fear that Chaparral, in the midst of growing as a residential community and struggling to define itself, was in danger of being overrun by industrial sites and turned into a dumping ground. They also expressed general concerns that the landfill would increase health risks by bringing more dust, flies, noise, traffic, and pollution. This large outpouring of community opposition was organized in part by the Colonias Development Council (CDC), a nonprofit organization dedicated to community improvement in New Mexico's *colonias*.

{6} From the record, it appears that the hearing officer let those who opposed the landfill speak, sometimes allowing public comment into the early hours of the morning. This testimony was summarized for the Secretary's consideration in the hearing officer's report, which recommended granting the permit. Despite the overwhelming community opposition, the Secretary, acting through the Director of the Water and Waste Management Division, granted the permit for a period of ten years subject to a list of twenty conditions. *See* § 74–9–24(A) (requiring the Secretary to rule on the application within 180 days after the application is completed).

{7} CDC appealed that decision to the Court of Appeals, which affirmed the Department's approval of the landfill permit. *See Colonias Dev. Council v. Rhino Envtl. Servs., Inc.*, 2003–NMCA–141, 134 N.M. 637, 81 P.3d 580. On certiorari to this Court, CDC acknowledges that community members were given an opportunity to speak but claims the hearing officer erred by interpreting the Department's role too narrowly. In CDC's view, the hearing officer perceived her duty as strictly confined to overseeing the technical requirements of the permit application. As a result, the Secretary approved the landfill permit based on an erroneous assumption that the Department was neither required nor allowed to consider the impact of the proliferation of landfills on a community's quality of life. This perception, CDC contends, ultimately undermined any influence the public's nontechnical testimony could have on the decision to grant a landfill permit.

{8} Specifically, CDC claims the hearing officer erred in not permitting Dr. Diana Bustamante to ask Rhino's general manager during cross-examination whether Rhino had conducted any social impact studies regarding the likely effect of the landfill on the community of Chaparral. Sustaining an objection by Rhino's counsel, the hearing officer told Dr. Bustamante that the issue was not one of the factors involved in the decision to issue a permit. In CDC's opinion, the hearing officer mistakenly assumed that the impact of the landfill on the community's quality of life is irrelevant. As we shall see, this decision of the hearing officer to narrow the scope of relevant testimony goes to the very heart of CDC's appeal.

{9} CDC further contends that the hearing officer erred in refusing to consider testimony regarding the adverse cumulative effects caused by the proliferation of landfills and other industrial sites. CDC claims there are four waste disposal facilities and three industrial sites near Chaparral.[2] Sister Diana Wauters testified that allowing another landfill near Chaparral would have "a negative impact on the social environment." Sister Wauters based her concerns about the proposed landfill on timing, location, and cumulative effect. In her view, Chaparral is "an unorganized, low-income community" that

---

*Formation and Remediation in El Paso County, Texas, and Doña Ana County, New Mexico*, 27 N.M. L.Rev. 33, 33–34 (1997) (discussing the various definitions of *colonias* ).

2. The record indicates that there is a closed solid waste landfill in Chaparral, a landfill south of

Alamogordo, 50–60 miles away, a landfill in Sunland Park, 40–50 miles away, and a landfill just south of Chaparral across the state border in Texas. In addition, other industrial sites near Chaparral include a tire disposal facility, an incinerator, and a sand and gravel operation.

does not have the structure needed to make informed decisions. Because other landfills already exist near the community, she said, the cumulative effect of putting another landfill two miles from Chaparral would create a perception of being "dumped on." Adding another landfill would stigmatize the community, she testified, hampering its ability to recognize and develop its assets. After stating Chaparral has "been inequitably burdened by poverty and pollution," Wauters urged the hearing officer to weigh considerations of a more sociological nature.

{10} On appeal, CDC contends the hearing officer, and ultimately the Secretary, disregarded Dr. Bustamante's line of questioning and Sister Wauters' testimony in a way that made public participation a sham. At one point, Wauters asked the hearing officer to explain her statement that social impact is irrelevant to the permitting process in light of the public hearing notice, which stated that all persons would be permitted to express their views. "I mean, what are we doing here?" Wauters asked. "I mean, those of us who are nontechnical experts or we're not scientists, why have we been invited here to express our opinions if it's irrelevant?" The hearing officer responded:

> [A]ny lawyer can point you to the Solid Waste Act and the Solid Waste Management Regulations which set out those grounds on which this permit is granted, denied or granted with conditions. And when I say that it is irrelevant to that decision, I don't mean that it is irrelevant to the entire proceeding. I mean that it will not form the basis for ... one of those three ultimate actions.

CDC contends the hearing officer improperly believed she was only allowed to consider technical testimony in the decision to grant a landfill permit, and improperly concluded the community's concerns about its quality of life were of no legal consequence.

{11} We now inquire whether the Department is required to admit and consider evidence addressing the impact of a proposed landfill, including the cumulative effect of the proliferation of landfills and other industrial sites, on a community's quality of life. We granted leave to the Catholic Diocese of Las Cruces and the South Valley Coalition of Neighborhood Associations and the New Mexico Environmental Law Center to file amicus curiae briefs in support of CDC's position.

## DISCUSSION

{12} CDC argues that the impact of the landfill on the community's quality of life, and the general concerns of community members opposed to the landfill, were not considered in determining whether to grant the solid waste permit. It contends that such considerations are required by the Environmental Improvement Act, NMSA 1978, §§ 74–1–1 to –16 (1971, as amended through 2003), the Solid Waste Act, and the regulations adopted pursuant to the acts. CDC does not challenge the technical issues addressed in the permitting process.

### Standard of Review

{13} As dictated by the Solid Waste Act, we will set aside the Secretary's final order regarding permit issuance if the decision is "(1) arbitrary, capricious or an abuse of discretion; (2) not supported by substantial evidence in the record; or (3) otherwise not in accordance with law." Section 74–9–30(B). "A ruling by an administrative agency is arbitrary and capricious if it is unreasonable or without a rational basis, when viewed in light of the whole record." *Rio Grande Chapter of the Sierra Club v. N.M. Mining Comm'n,* 2003–NMSC–005, ¶ 17, 133 N.M. 97, 61 P.3d 806. This Court will generally defer to an agency's reasonable interpretation of its own ambiguous regulations. *See id.*

### Regulatory Background

{14} As an initial step, we place the issues on appeal in the context of the regulatory setting designed by the Legislature. The Environmental Improvement Act grants the Department and its Environmental Improvement Board (Board) the power to regulate the environment on behalf of the citizens of New Mexico. *See* §§ 74–1–5, –7(A). The act's purpose is to

> ensure an environment that in the greatest possible measure will confer optimum

health, safety, comfort, and economic and social well-being on its inhabitants; will protect this generation as well as those yet unborn from health threats posed by the environment; and will maximize the economic and cultural benefits of a healthy people. Section 74–1–2.

{15} In addition to implementing the Environmental Improvement Act, the Department through the Board is charged with the maintenance, development, and enforcement of rules and standards regarding the disposal of solid waste as provided in the Solid Waste Act. *See* §§ 74–1–5, –7(A)(14). The Solid Waste Act directs "the establishment of a comprehensive solid waste management program." Section 74–9–2(A). One purpose of the act is to "plan for and regulate, in the most economically feasible, cost-effective and environmentally safe manner, the reduction, storage, collection, transportation, separation, processing, recycling and disposal of solid waste." Section 74–9–2(D). Another important purpose is to "enhance the beauty and quality of the environment; conserve, recover and recycle resources; and protect the public health, safety and welfare." Section 74–9–2(C).

{16} The Solid Waste Act delegates authority to the Board to adopt regulations to administer "the cost-effective and environmentally-safe siting" and operation of solid waste facilities. Section 74–9–8. In issuing those regulations, the Board is required to "assure that the relative interests of the applicant, other owners of property likely to be affected and the general public will be considered prior to the issuance of a permit for a solid waste facility." Section 74–9–8(A). In addition, the Board is required to adopt procedural regulations providing for notice and a public hearing on permit actions. *See* § 74–9–29 (ensuring all interested persons "a reasonable opportunity" to be heard).

{17} Pursuant to this statutory authority, the Board adopted regulations providing technical siting criteria. *See* 20.9.1.300(B) NMAC (2001) (listing specific criteria such as prohibiting locating landfills near flood plains, wetlands, fault lines, and historically or archeologically significant sites). The

Board also adopted regulations governing permitting procedures, which encourage public participation. *See* 20.1.4.1 NMAC (2001); 20.1.4.6 NMAC (1997) (ensuring "the ability to participate of all persons and entities who desire to take part"); 20.1.4.100(B) NMAC (2002) (providing for liberal construction of procedures in order to carry out purposes of statutes and regulations and "to facilitate participation by members of the public, including those not represented by counsel").

{18} Finally, the regulations regarding permit issuance state: "The Secretary *shall* issue a permit if the applicant demonstrates that the other requirements of this Part are met *and* the solid waste facility application demonstrates that neither a hazard to public health, welfare, or the environment nor undue risk to property will result." 20.9.1.200(L)(10) NMAC (2001) (emphasis added).

**The Importance of Public Participation**

{19} We first address the role of public participation in the permitting process. Pursuant to the authority delegated by the enabling statutes, and the regulations adopted to implement those statutes, CDC urges this Court to conclude that the Secretary is required to allow testimony regarding the impact of a proposed landfill on a community's quality of life. Such consideration is required, CDC argues, in order to realize the general purposes of the statutes to confer optimum social well-being, to protect public health, safety and welfare, and to assure that "relative interests" of all parties are considered.

{20} In the view of Rhino and the Department, on the other hand, the purposes of the enabling statutes to promote public welfare and social well-being are addressed in the implementing regulations. Concerns such as landfill proliferation are not mentioned in the regulations, they assert, and cannot be an independent factor in considering whether to issue a solid waste facility permit. The Department sees its role as dictated by the technical regulations. If the siting criteria is met, they argue, the Department has no discretion to deny a permit or impose conditions on one. The Court of Appeals agreed,

stating, "[The Department] cannot reasonably be expected to weigh sociological concerns, which it has no expertise in doing. Its role is to pass judgment on the technical aspects of a solid waste site, a subject within its expertise and which it was designed to do." *Colonias,* 2003–NMCA–141, ¶ 16, 134 N.M. 637, 81 P.3d 580. Thus, the Court of Appeals determined that the hearing officer could properly limit evidence relating to "social impact" because the term is not mentioned in the statutes or regulations, and therefore is legally irrelevant. *Id.* ¶ 19.

{21} We think the Court of Appeals' view of the Department's role is too narrow and has the potential to chill public participation in the permitting process contrary to legislative intent. The Solid Waste Act is replete with references to public input and education. The process of applying for a landfill permit attempts to facilitate public participation in several ways. First, the applicant submits an application for a permit, which includes all the technical information required to support the permit, and files notice to the public and affected parties. *See* §§ 74–9–20, –22. The Department solicits comments, and once the application is complete, conducts a public hearing, which provides the public and interested parties an opportunity to comment and present evidence. *See* § 74–9–23. By directing the Department to adopt procedural regulations to provide all persons with a reasonable opportunity to be heard, the Legislature has clearly indicated its intent to ensure that the public plays a vital role in the hearing process. *See* § 74–9–29(A)(4); *see also* 20.1.4.6 NMAC (1997) (stating objective of the hearing procedures is to ensure the ability of all persons and entities to participate); 20.1.4.100(B) NMAC (requiring a liberal construction of procedures in order to fulfill the purposes of the statute and to facilitate participation by the public); 20.1.4.300 NMAC (providing that any person may provide a general written or oral statement or nontechnical testimony concerning the application at the hearing).

{22} Our courts have previously emphasized that legislative policy favors the public's ability to participate meaningfully in the landfill permitting process. *See Martinez v.*

*Maggiore,* 2003–NMCA–043, ¶¶ 15, 17, 133 N.M. 472, 64 P.3d 499; *id.* ¶ 28 (Pickard, J., specially concurring). In *Martinez,* the Court of Appeals found that the Department's failure to comply with statutory notice requirements rendered subsequent administrative proceedings invalid. *Id.* ¶ 13. In demanding a new public hearing after proper notice, the court recognized the importance of "vindicating the general public's right to participate in the permitting process" and the important interest in insuring that modifications to a landfill permit "do not adversely affect the quality of life" of the surrounding community. *Id.* ¶¶ 18–19.

{23} In finding public participation and the hearing requirement central to the Solid Waste Act, our courts have protected and promoted the role of public input in the Department's decision to issue a permit. *See Southwest Research & Info. Ctr. v. State,* 2003–NMCA–012, ¶ 37, 133 N.M. 179, 62 P.3d 270; *Joab, Inc. v. Espinosa,* 116 N.M. 554, 558, 865 P.2d 1198, 1202 (Ct.App.1993). In our view, the Legislature did not limit the Department's role to reviewing technical regulations. Instead, our courts have acknowledged that the Secretary must use discretion in implementing the Solid Waste Act and its regulations in order to encourage public participation in the permitting process. *See Joab,* 116 N.M. at 558, 865 P.2d at 1202 (observing that the Secretary has statutory authority to exercise discretion to address concerns raised at a public hearing).

{24} Given the Legislature's goal to involve the public in the permitting process to the fullest extent possible, we do not agree with the Court of Appeals that the Secretary was not allowed to consider testimony relating to the community's quality of life. The Legislature clearly believed public participation is vital to the success of the Solid Waste Act. Members of the public generally are not technical experts. The Legislature did not require scientific evidence in opposition to a landfill permit, but instead envisioned that ordinary concerns about a community's quality of life could influence the decision to issue a landfill permit. While testimony relating to something as broad as "social impact" may not require denial of a

permit, the hearing officer must listen to concerns about adverse impacts on social well-being and quality of life, as well as report them accurately to the Secretary. In reviewing the hearing officer's report, the Secretary must consider whether lay concerns relate to violations of the Solid Waste Act and its regulations. *See* § 74–9–24(A) (expressly directing that the Secretary "may deny a permit application on the basis of information in the application or evidence presented at the hearing, or both, if he makes a finding that granting the permit would be contradictory to or in violation of the Solid Waste Act or any regulation adopted under it"). Therefore, the Secretary should consider issues relating to public health and welfare not addressed by specific technical regulations.[3]

{25} To counter this interpretation, the Department claims it has consistently interpreted the Solid Waste Act and the regulations implementing the act as not requiring the denial of solid waste applications due to general concerns raised by members of the public, and that our courts have agreed. The Department cites *Joab*, 116 N.M. 554, 865 P.2d 1198, contending *Joab* stands for the proposition that "individual residents['] concerns about the negative impacts of a landfill do not require denial of a landfill permit." The hearing officer's report also relied on *Joab* when it stated that "testimony from lay witnesses is [an] insufficient basis for a finding that the landfill endangers public health or welfare or the environment, and it does not provide sufficient grounds for denial of the permit."

{26} We reject the Department's representation of *Joab* as a general rule that public testimony about a landfill's negative impact can never affect the Secretary's decision. In *Joab*, community members protested permit applications for a landfill and a medical incinerator within that landfill. *Id.* at 556, 865 P.2d at 1200. Based on the

opposition of individual residents, the Department denied the incinerator permit, but approved the landfill permit with conditions. *Id.* In affirming the Department's decision in *Joab*, our Court of Appeals stated that "[a] public nuisance must affect a considerable number of people or an entire community." *Id.* at 559, 865 P.2d at 1203. The court concluded that the evidence in that case did not require the Secretary to find the landfill "adversely affected the entire community's health, welfare, or safety." *Id.* Far from supporting the Department's position, *Joab* establishes that community concerns *can* affect the Secretary's decision to deny a permit or impose conditions on one. *Joab* is consistent with the idea that the Secretary must consider public testimony in deciding whether a landfill permit affects an entire community's health, welfare or safety, but that such testimony need not be determinative in the Secretary's discretion.

{27} We find no reason to defer to the Department's interpretation that it is not required to consider public testimony relating to general concerns and the community's quality of life. *See Atlixco Coalition v. County of Bernalillo*, 1999–NMCA–088, ¶ 26, 127 N.M. 549, 984 P.2d 796 (stating courts should not defer to an agency interpretation if the agency fails to consider important issues rather than "using its expertise to discern the policies embodied in an enactment") (quoted authority omitted). As a result, we hold that the Secretary abused his discretion by limiting the scope of testimony during the public hearing and interpreting the Department's role as confined to technical oversight.

## Proliferation

■■■ {28} We next address CDC's claim that the hearing officer and the Secretary failed to consider the proliferation of industrial sites. This claim involves statutory interpretation, which we review *de novo*. *See*

---

**3.** In fact, the Department already allows the consideration of issues that are not specified in a particular regulation but relate to quality of life. Rhino was allowed to introduce evidence regarding the *benefits* of the landfill to the community, such as Rhino's plans to lend heavy equipment to help build a park and to establish a community improvement fund to purchase emergency equipment for the fire department. This suggests that the hearing officer and the Department believed evidence relating to the impact of the proposed landfill on the community's quality of life *was* relevant to the decision to grant a permit. Thus, it seems within the intent of the Legislature that the public be allowed to introduce opposing information.

*Sierra Club,* 2003–NMSC–005, ¶ 17, 133 N.M. 97, 61 P.3d 806. Our ultimate goal in interpreting a statute is to ascertain and give effect to the intent of the Legislature. *See State ex rel. Helman v. Gallegos,* 117 N.M. 346, 353, 871 P.2d 1352, 1359 (1994). The plain language of the statute is the first indicator of legislative intent. *See High Ridge Hinkle Joint Venture v. City of Albuquerque,* 1998–NMSC–050, ¶ 5, 126 N.M. 413, 970 P.2d 599.

 {29} Although we hold that the Department must allow testimony regarding the impact of a landfill on a community's quality of life, we agree with the Department that its authority to address such concerns requires a nexus to a regulation. Like the Court of Appeals, we are not persuaded that the general purposes of the Environmental Improvement Act and the Solid Waste Act, considered alone, provide authority for requiring the Secretary to deny a landfill permit based on public opposition. *See Colonias,* 2003–NMCA–141, ¶ 13, 134 N.M. 637, 81 P.3d 580. The purposes of the enabling acts, which include the goal of protecting the "public health, safety and welfare," are designed to invoke the general police power of the state. *See City of Santa Fe v. Gamble–Skogmo, Inc.,* 73 N.M. 410, 415, 389 P.2d 13, 18 (1964) (observing "that the police power may be exercised only to protect and promote the safety, health, morals and general welfare"). This general expression of legislative police power, without more, does not create a standard for protecting "public health, safety and welfare." Thus, the Court of Appeals was correct to reject CDC's reliance on the purposes of the acts as a statutory mandate to respond to issues that fit ever so loosely under the umbrella of "sociological concerns." Such a broad mandate would offer no guidance to the Department, and violate the well-settled principle that a legislative body may not vest unbridled or arbitrary power in an administrative agency. *Id.* at 417, 389 P.2d at 20 (observing that a legislative body must furnish an administrative agency a reasonably adequate standard to guide it).

 {30} Unlike the Court of Appeals, however, we do find that quality of life concerns expressed during the hearing bear a relationship to environmental regulations the Secretary is charged with administering. Although both parties refer to the issues on appeal in a wide variety of ways, including "social impact," "sociological concerns," "social well-being," and "environmental justice," we believe there are legitimate concerns at the core of CDC's claim that are within the purview of the Secretary's oversight role. Contrary to the Department's position, the impact on the community from a specific environmental act, the proliferation of landfills, appears highly relevant to the permit process.

{31} As we have discussed, the regulations implementing the Solid Waste Act demand more from the Department than mere technical oversight. The regulations regarding permit issuance direct the Secretary to issue a permit if the applicant fulfills the technical requirements *and* "the solid waste facility application demonstrates that neither a hazard to public health, welfare, or the environment nor undue risk to property will result." 20.9.1.200(L)(10) NMAC; *see also* 20.9.1.200(L)(16)(c) NMAC (providing that a specific cause for denying a permit application is a determination that the permitted activity endangers public health, welfare or the environment). The regulations also require all solid waste facilities to be *located* and operated "in a manner that does not cause a public nuisance or create a potential hazard to public health, welfare or the environment." 20.9.1.400(A)(2)(a) NMAC (2001). The regulations do not limit the Secretary's review to technical regulations, but clearly extend to the impact on public health or welfare resulting from the environmental effects of a proposed permit. *Cf. El Dorado at Santa Fe, Inc. v. Bd. of County Comm'rs,* 89 N.M. 313, 318, 551 P.2d 1360, 1365 (1976) (concluding that under the applicable subdivision statutes, nothing remained for the county board to do but the ministerial act of endorsing approval of plats that complied with all statutory requirements).

{32} Landfill opponents presented testimony that Chaparral is a residential, low income border community that is being overrun by industrial sites including numerous pre-exist-

ing landfills. If this is true, we think it is reasonable for the Department to consider whether the cumulative effects of pollution, exacerbated by the incidences of poverty, may rise to the level of a public nuisance or hazard to public health, welfare, or the environment.[4] If proliferation has an identified effect on the community's development and social well-being, it is not an amorphous general welfare issue, but an environmental problem. The adverse impact of the proliferation of landfills on a community's quality of life is well within the boundaries of environmental protection. Thus, the testimony regarding the impact of the proliferation of landfills is relevant within the context of environmental protection promised in the Solid Waste Act and its regulations. For that reason, the Secretary must evaluate whether the impact of an additional landfill on a community's quality of life creates a public nuisance or hazard to public health, welfare, or the environment.

{33} The Department concluded as a matter of law that granting the permit would not result in a public nuisance or a hazard to public health, welfare or the environment. These conclusions, however, were made only after the Department incorrectly found that lay testimony relating to living near multiple disposal facilities was beyond the scope of the Secretary's authority for granting or denying a landfill. In our view, the Department's own regulations not only allow, but require consideration of the cumulative effect of large-scale garbage dumps and industrial sites on a single community.

{34} As the regulations indicate, the Department cannot ignore concerns that relate to environmental protection simply because they are not mentioned in a technical regulation. The Department has a duty to interpret its regulations liberally in order to realize the purposes of the Acts. *See Atlixco*

*Coalition v. Maggiore*, 1998–NMCA–134, ¶ 15, 125 N.M. 786, 965 P.2d 370. Because the impact of the proliferation of landfills and industrial sites on a community is relevant to environmental protection, we conclude that the Solid Waste Act and its regulations require the Department to consider whether evidence of the harmful effects from the cumulative impact of industrial development rises to the level of a public nuisance or potential hazard to public health, welfare or the environment. *Cf. City of Santa Fe*, 73 N.M. at 412–15, 389 P.2d at 14–17 (holding that an ordinance creating an historical district and requiring new buildings harmonize with existing structures was within the scope of the enabling statute allowing municipalities to zone consistently with a comprehensive plan "to promote the health and general welfare").

■ {35} We also reject the argument that any consideration of testimony and other evidence regarding proliferation would be ambiguous, without adequate standards, and impossible to enforce. In certain situations, when an agency is charged with protecting public health, safety, and welfare, it may be difficult to lay down a definite comprehensive rule. *See Old Abe Co. v. N.M. Mining Comm'n*, 121 N.M. 83, 92–93, 908 P.2d 776, 785–86 (Ct.App.1995). Our courts have recognized that a certain amount of discretion is necessary to administer and enforce regulations so as to implement legislative enactments and meet the needs of individual justice. *Id.*

### Remedy

■ {36} Having concluded that the hearing officer erred in characterizing testimony relating to the community's quality of life as irrelevant, we next address the proper remedy. The Department argues that even

---

4. Some opponents of the landfill consider the proliferation issue as a matter of "environmental justice." While we agree with Rhino and the Department that "environmental justice" is not a specific criterion under the state permitting procedures, we are concerned about the Department's treatment of the subject of proliferation. We cannot foreclose the possibility that interested parties or members of the public might build a strong case against the proliferation of landfills

in a certain geographical area by demonstrating how an additional landfill in a low-income, undeveloped, minority community without access to adequate health care would cause harmful physical, economic, psychological, and social effects. *See* Edward Patrick Boyle, Note, *It's Not Easy Bein' Green: The Psychology of Racism, Environmental Discrimination, and the Argument for Modernizing Equal Protection Analysis*, 46 Vand. L.Rev. 937, 967 & n. 167 (1993).

if we determine the excluded testimony is relevant, the Department did consider it. In the Department's view, the parties and members of the public opposed to the landfill simply failed to present enough evidence to require denial of the permit. CDC responds that there is no way to measure the impact of the hearing officer's harmful statements about the irrelevancy of social impact evidence, and that those remarks may have created a "chilling effect" on additional evidence that may have come forth. Thus, CDC argues, we must remand for a new hearing.

{37} While we give serious consideration to CDC's fears about a chilling effect, our review of the record indicates that many members of the community were allowed to express their opposition to the landfill at the hearing with respect to its impact on quality of life. That testimony was summarized in the hearing officer's report. No opponents of the landfill tried to introduce evidence through expert witnesses, with the exception of Sister Wauters, who nonetheless testified as a lay person, regarding sociological concerns. Therefore, we cannot conclude that CDC was entirely prevented from presenting testimony and other evidence on this issue, or that any such chilling effect actually existed.

{38} On the other hand, the Department's present position that it gave proper consideration to quality of life issues, though it was not required to do so, is belied by the Department's position below. The findings and conclusions adopted by the Secretary state that the social impact of living near a disposal facility is beyond the scope of the Secretary's authority for granting or denying a permit. By reaching this broad conclusion, the Secretary made clear that no matter how much evidence was presented, it would not be considered. The hearing officer characterized the evidence as irrelevant as to the three ultimate actions: granting, denying or conditioning a permit.

{39} Nor is there an explanation as to why public testimony in opposition to the landfill was inadequate evidence to rebut Rhino's showing that it complied with the regulations. According to the regulations governing the Department's permitting procedures, "[t]he Secretary may adopt, modify, or set aside the hearing officer's recommended decision, and shall set forth in the final order the reasons for the action taken." 20.1.4.500(D)(2) NMAC (1997). Section 74–9–29(B)(1) of the Solid Waste Act requires that the Secretary's final order following an adjudicatory hearing "shall state the reasons for the action." *Atlixco Coalition v. Maggiore*, 1998–NMCA–134, ¶ 15, 125 N.M. 786, 965 P.2d 370.

{40} The Department argues that it did respond to community concerns raised at the hearing by revising and imposing additional conditions on the permit. Imposing conditions, however, is not the only recourse the Secretary may take. The Secretary did not clearly state the reasoning for the decision to grant the permit in the face of so much public testimony against it. Thus, we have no assurance from the record that the Department actually factored this testimony into the final decision, despite the Department's claim on appeal that it must have done so.

{41} The Secretary cannot ignore relevant factors or omit important aspects of the problem. *See id.* ¶ 24 ("[A]n agency's action is arbitrary and capricious if it provides no rational connection between the facts found and the choices made, or entirely omits consideration of relevant factors or important aspects of the problem at hand."). Without a reasoned explanation relating to the subject of the social impact of the proliferation of landfills, it appears that the Secretary ignored an entire line of evidence in reaching his decision on the final order. "Allowing the Secretary to ignore material issues raised by the parties in this manner would render their right to be heard illusory." *Id.*

{42} As noted previously, because the Legislature contemplated public participation as such an important part of the Solid Waste Act, our courts carefully protect the role of a meaningful public hearing in order to address quality of life. *See Martinez*, 2003–NMCA–043, ¶¶ 14–19, 133 N.M. 472, 64 P.3d 499. Given the concern expressed in *Martinez* that procedural defects can undermine the meaningfulness of a public hearing, we

must construe the permit procedures to facilitate meaningful participation by members of the public. *See* 20.1.4.100(B) NMAC. The only way to achieve this goal is to set aside the final order, and remand this case to the Department to conduct a limited public hearing on the evidence CDC claims was wrongfully excluded, and to allow the Secretary to reconsider the evidence already proffered concerning the impact of the proliferation of landfills on the community's quality of life.

{43} Because of the potential chilling effect of the hearing officer's error, we direct the Secretary to afford CDC a reasonable opportunity at a limited public hearing to tender additional evidence regarding the impact of proliferation. The limited public hearing may include cross-examination of Rhino witnesses who previously testified. On this point we caution the hearing officer that it was error to limit the cross-examination of Dr. Bustamante. *See* 20 NMAC 1.4.400(B)(2) (permitting cross-examination to be limited only "to avoid harassment, intimidation, needless expenditure of time, or undue repetition"). Rhino shall have a reasonable opportunity to respond. We further instruct the Secretary to reconsider the public testimony opposing the landfill and explain the rationale for rejecting it, if the Secretary decides to do so. We are not suggesting that the Secretary must reach a different result, but we do require, as the Act itself requires, that the community be given a voice, and the concerns of the community be considered in the final decision making.

**CONCLUSION**

{44} For the foregoing reasons, we set aside the final order, and remand to the Department for the Secretary to afford the relief specified in this opinion.

{45} **IT IS SO ORDERED.**

WE CONCUR: PAMELA B. MINZNER, PATRICIO M. SERNA, and EDWARD L. CHÁVEZ, Justices.