2008-NMCA-031

179 P.3d 1228

**In the Matter of Request for a Class 3 Permit Modification for Corrective Measures for the Mixed Waste Landfill Sandia National Laboratories, Bernalillo County, New Mexico, EPA ID No. NM5890110518.**

**CITIZEN ACTION, Appellant,**

v.

**SANDIA CORPORATION, and/or on behalf of Sandia National Laboratories, and the New Mexico Environment Department, Appellees.**

No. 25,896.

Court of Appeals of New Mexico.

Dec. 19, 2007.

Certiorari Denied, No., 30,844, Feb. 25, 2008.

Law Offices of Nancy L. Simmons, P.C., Nancy L. Simmons, Albuquerque, NM, for Appellant.

Montgomery & Andrews, P.A., Louis W. Rose, Jeffrey J. Wechsler, Santa Fe, NM, Sandia Corporation, Amy J. Blumberg, Albuquerque, NM, for Appellee Sandia Corporation.

New Mexico Environment Department, Tannis L. Fox, Deputy General Counsel/Special Assistant Attorney General, Santa Fe, NM, for Appellee New Mexico Environment Department.

## OPINION

CASTILLO, Judge.

{1} Citizen Action appeals a decision by the Secretary of the New Mexico Environment Department (Secretary) granting the request of Sandia National Laboratories (Sandia) for a Class 3 Permit Modification for Corrective Measures for the Mixed Waste Landfill (MWL) located at Sandia. In challenging the remedy adopted by the Secretary in his final order, Citizen Action makes a number of arguments. As to the contention that Sandia was required to apply for a closure or post-closure permit, rather than a permit modification for the MWL, we hold that this issue is not jurisdictional and, further, that it was not preserved. We hold

that the Secretary did not abuse his discretion by adopting the findings of the hearing officer and, further, that those findings were supported by substantial evidence. We conclude that the Secretary did not render the public comments irrelevant by submitting his written response to these comments after issuing a final order. Accordingly, we affirm the Secretary's order.

## I. BACKGROUND

{2} Sandia is a federal facility owned by the Department of Energy (DOE). Since 1945, Sandia has conducted research and development of conventional and nuclear weapons, national security measures, and alternative energy sources. As a result of this research and development, Sandia has generated hazardous, radioactive, mixed, and solid wastes. Mixed waste is waste that contains both radioactive and solid waste. Sandia disposed of low-level radiation waste and minor amounts of mixed waste at the MWL from 1959 until 1988.

{3} The regulatory scheme governing mixed waste landfills has developed over a number of years. *See* Angela Cole Bonstead, *EPA's Mixed Approach to Mixed Waste*, 8 Envtl. Law. 521, 536–546 (2002). The first comprehensive federal law relating to the generation, storage, treatment, and disposal of hazardous waste was passed when Congress enacted the federal Resource Conservation and Recovery Act of 1976 (RCRA), 42 U.S.C. §§ 6901–6992k (1976, as amended through 2002). *See* Bonstead, *supra*, at 536–37. Later, Congress passed the Hazardous and Solid Waste Amendments of 1984 (HSW Amendments), Pub.L. No. 98–616, 98 Stat. 3221 (codified as amended at 42 U.S.C. §§ 6901–6981). The HSW Amendments expanded the authority under RCRA to require corrective action as a remedy for certain hazardous waste sites and designated solid waste management units (SWMU). The MWL was designated as an SWMU in 1993, as we explain in paragraph 6 of this opinion.

{4} In 1985, the federal Environmental Protection Agency (EPA) authorized the State of New Mexico to administer and enforce a hazardous waste program, pursuant to the New Mexico Hazardous Waste Act, NMSA 1978, §§ 74–4–1 to –14 (1977, as amended through 2007). The HSW Amendments continued to be enforced by the EPA until 1996, when New Mexico obtained authorization for their enforcement. Citizen Action does not dispute that the New Mexico Environment Department (NMED) regulates the MWL under the New Mexico Hazardous Waste Act or that pursuant to RCRA, the EPA authorizes NMED to enforce Sandia's compliance with applicable federal law.

{5} Sandia received a permit from NMED to store hazardous waste in 1992. The MWL was not included in the 1992 permit because the MWL stopped accepting mixed waste for permanent storage toward the end of 1988 and because NMED did not yet have the authority to implement corrective measures at facilities no longer accepting waste.

{6} In 1993, the EPA issued a document titled Module IV. This permit authorized the MWL under federal law and operated together with the 1992 NMED permit as a joint permit. Module IV designates the MWL as an SWMU, subject to corrective measures under the HSW Amendments. When NMED took over enforcement of the HSW Amendments in 1996, NMED also took over enforcement of Module IV and oversight of the corrective measures at the MWL.

{7} Sandia conducted internal investigations of the MWL to determine whether remediation was required. As a result of these investigations, Sandia recommended that no further action be taken at the MWL. NMED rejected Sandia's recommendation, and in 1998, NMED notified Sandia that corrective action was required for the MWL. In 2001, NMED compelled Sandia to undertake a corrective measures study (Study), pursuant to Section 74–4–10.1(A). The purpose of the Study was to recommend what corrective action, or remedy, should be implemented at the MWL. The Study examined four alternative remedies: (1) no further action, (2) vegetative soil cover, (3) vegetative soil cover with bio-intrusion barrier, and (4) future excavation. Sandia ultimately recommended a vegetative soil cover to be the most appropriate remedy for the MWL. NMED again disagreed and, instead, elected to implement a vegetative soil cover with a bio-intrusion barrier. In August 2004, NMED proposed its selected remedy in a draft per-

mit. A public evidentiary hearing regarding the draft permit was held in December 2004.

{8} At the hearing, five parties—including Sandia, NMED, Citizen Action, Dr. Eric Nuttall, and WERC: A Consortium for Environmental Education and Technology Development (WERC)—presented technical testimony. Citizen Action recommended that NMED select excavation and disposal as the remedy to be applied to the MWL. Dr. Nuttall and WERC favored a fate and transport model, which would allow Sandia to fully assess the contaminants. The public was actively involved in the proceedings: approximately 30 people testified, approximately 15 submitted written comments, and more than 350 mailed in postcards. On April 20, 2005, the hearing officer submitted her report, which was more than eighty pages long. The report included a summary of the testimony given at the hearing, findings of fact, conclusions of law, a recommended decision, and a proposed order.

{9} The Secretary, with few changes, none of which are material to this appeal, adopted the remedy proposed in the hearing officer's report; the final order was issued on May 26, 2005. The remedy was an amalgamation of the testimony at the hearing, which combined the previously selected remedy of a vegetative soil cover with a bio-intrusion barrier and the development of a fate and transport model. The Secretary required Sandia to develop systems (1) to trigger future remedial action, (2) to conduct long-term monitoring, and (3) to maximize public comment and access to documents. The order mandates that every five years, Sandia prepare a report to evaluate the feasibility of excavation and the continued effectiveness of the remedy selected. NMED issued a response to public comments on August 2, 2005. In this consolidated appeal, Citizen Action contests both the Secretary's final order and the response to public comments.

## II. DISCUSSION

{10} Citizen Action challenges the Secretary's order on several bases. First, Citizen Action argues that the entire administrative proceeding for permit modification was improper because there was no valid permit to modify and, further, that the absence of a valid permit deprived the Secretary of juris-

diction over the proceedings. Citizen Action also disputes that the hearing officer and the Secretary properly addressed certain evidence presented at the hearing. Next, Citizen Action contests a number of individual findings made by the hearing officer and contends that the Secretary misunderstood his authority to implement a creative remedy. Last, Citizen Action argues that the Secretary did not sufficiently consider public comment before issuing the final order. We address each argument in turn.

## A. The Permit

{11} We first consider Citizen Action's argument that the Secretary erred as a matter of law by concluding that Sandia need only obtain a permit modification, rather than an entirely new closure or post-closure permit. According to Citizen Action, whether or not the proper permit was issued implicates the Secretary's jurisdiction: if the MWL did not have a valid permit, then the Secretary had no jurisdiction to modify a permit. NMED essentially responds that the matter was not preserved because the scope of the hearing was limited to remedy selection. The question of subject matter jurisdiction does not require preservation. *See* Rule 12–216(B) NMRA. Accordingly, we begin by examining whether the Secretary had jurisdiction to modify the joint permit.

### 1. Jurisdiction

{12} We determine de novo whether an agency has jurisdiction over the parties or the subject matter of a case. *See Morningstar Water Users Ass'n v. N.M. Pub. Util. Comm'n*, 120 N.M. 579, 583, 904 P.2d 28, 32 (1995). The subject matter jurisdiction of an administrative agency is defined by statute, and an agency is limited to exercising only the authority granted by statute. *See Martinez v. N.M. State Eng'r Office*, 2000–NMCA–074, ¶ 22, 129 N.M. 413, 9 P.3d 657. The New Mexico Environmental Improvement Act, NMSA 1978, §§ 74–1–1 to –16 (1971, as amended through 2003), created NMED and charged it with the responsibility for environmental management. Section 74–1–2. Section 74–1–7(A)(13) vests NMED with jurisdiction to "maintain, devel-

op and enforce rules and standards" in the area of "hazardous wastes ... [,] as provided in the Hazardous Waste Act." In 1990, NMED received authority from the EPA to regulate mixed waste, under the New Mexico Hazardous Waste Act. *See* State of New Mexico: Final Authorization of State Hazardous Waste Management Program, 55 Fed.Reg. 28,387 (July 11, 1990); *see also* 40 C.F.R. § 272.1601 (2006). Because NMED has jurisdiction to regulate mixed waste under New Mexico law and because the MWL is a mixed waste landfill, the Secretary has jurisdiction, under the New Mexico Hazardous Waste Act, to "maintain, develop and enforce rules and standards" regarding the MWL. Section 74–1–7(A)(13). Enforcement of rules and standards necessarily includes permit questions such that any issues regarding the proper permit for a mixed waste landfill would necessarily be determined by the Secretary. *See* § 74–4–4.2 (setting forth requirements for permit issuance, denial, modification, suspension, and revocation). Accordingly, we conclude that the Secretary has jurisdiction over questions relating to the proper category of permit for the MWL.

{13} This conclusion is consistent with what Citizen Action is really requesting—that our Court hold that a post-closure permit is required and then remand this case to the Secretary with instructions to immediately close the MWL, consistent with post-closure regulations. *See Doña Ana Mut. Domestic Water Consumers Ass'n v. N.M. Pub. Regulation Comm'n*, 2006–NMSC–032, ¶ 8, 140 N.M. 6, 139 P.3d 166 ("This challenge is directed at the correctness of the [agency's] determination[,] rather than the [agency's] authority to address the issue or power to force the parties to comply with its orders. We therefore review this matter as an agency determination[.]"). If the Secretary lacks subject matter jurisdiction, then our Court is similarly without jurisdiction to decide this issue, a result not contemplated by Citizen Action. *See Maso v. N.M. Taxation & Revenue Dep't*, 2004–NMCA–025, ¶ 13, 135 N.M. 152, 85 P.3d 276 ("[A]n appeal from a court or agency that lacks subject matter jurisdiction confers no jurisdiction on the appellate court." (internal quotation marks and citation omitted)).

{14} Because the question of permit status is not one of jurisdiction, we continue our analysis and examine whether this question is one our Court may review on appeal. *See Lopez v. Las Cruces Police Dep't*, 2006–NMCA–074, ¶ 23, 139 N.M. 730, 137 P.3d 670 ("Because we have determined that the [issue] does not implicate jurisdiction, the [party] was required to properly and timely preserve its arguments on this point.").

## 2. Preservation

{15} Issues raised on appeal from an administrative hearing must be preserved. *Selmeczki v. N.M. Dep't of Corr.*, 2006–NMCA–024, ¶ 23, 139 N.M. 122, 129 P.3d 158. In support of preservation, Citizen Action points us to testimony that the "NMED should have required Sandia to submit a closure plan under Part 264 or Part 265 for the mixed waste landfill in lieu of requiring corrective action as a solid waste management unit." Nowhere in the cited testimony does the witness suggest that Sandia did not follow the appropriate permitting process. A review of Citizen Action's submitted proposed findings of fact and conclusions of law is similarly void of any argument that Sandia should have to apply for a new closure or post-closure permit. According to the hearing officer's report of witness testimony, the only evidence offered regarding the appropriate regulatory framework for the MWL was from William Moats, an NMED employee. Moats explained the permitting process that Sandia went through, and the hearing officer incorporated his testimony into her findings.

{16} We will not search the voluminous record for evidence that Citizen Action preserved the argument that Sandia has operated under the incorrect regulatory framework for more than a decade. *See In re Norwest Bank of N.M., N.A.*, 2003–NMCA–128, ¶ 30, 134 N.M. 516, 80 P.3d 98 (stating that this Court will not search the record for evidence of preservation). There is no indication that the permit status of the MWL was an issue of contention at the administrative hearing. The purpose of the hearing was to select a remedy for the MWL. Citizen Action duly operated within the defined scope of the hearing and argued that a particular remedy,

future excavation, should be adopted by the Secretary.

{17} In order for a party to sufficiently preserve an issue during an administrative hearing, the party must elicit testimony and invoke a ruling by the hearing officer. *Garza v. N.M. Taxation & Revenue Dep't*, 2004–NMCA–061, ¶ 8, 135 N.M. 673, 92 P.3d 685; *see also* Rule 12–216(A). There was testimony that certain federal regulations required a particular remedy, but Citizen Action cites no testimony to the effect that NMED could not modify Sandia's existing Module IV permit or that Sandia should be required to apply for a different permit altogether. Further, Citizen Action fails to show us where it made an objection to the type of permit that formed the basis for the proceedings. We will not address these arguments for the first time on appeal. *See Pickett Ranch, LLC v. Curry*, 2006–NMCA–082, ¶ 3, 140 N.M. 49, 139 P.3d 209 (declining to reach an issue raised on appeal because it was not raised before the hearing officer); *Builders Contract Interiors, Inc. v. Hi–Lo Indus., Inc.*, 2006–NMCA–053, ¶ 5, 139 N.M. 508, 134 P.3d 795 (rejecting an argument made for the first time on appeal).

## B. Challenges to Findings

{18} Citizen Action challenges a number of specific findings made by the hearing officer. We set aside final orders of the Secretary only if the decision was "(1) arbitrary, capricious or an abuse of discretion; (2) not supported by substantial evidence in the record; or (3) otherwise not in accordance with law." NMSA 1978, § 74–9–30(B) (1990). " 'A ruling by an administrative agency is arbitrary and capricious if it is unreasonable or without a rational basis, when viewed in light of the whole record.' " *Colonias Dev. Council v. Rhino Envtl. Servs. Inc.*, 2005–NMSC–024, ¶ 13, 138 N.M. 133, 117 P.3d 939 (quoting *Rio Grande Chapter of the Sierra Club v. N.M. Mining Comm'n*, 2003–NMSC–005, ¶ 17, 133 N.M. 97, 61 P.3d 806).

### 1. Basis for Findings

{19} Citizen Action first generally contends that the hearing officer did not sufficiently explain the basis for her findings, as required by *Atlixco Coalition v. Maggiore*, 1998–NMCA–134, 125 N.M. 786, 965 P.2d 370. In *Atlixco*, we considered whether a decision by the Secretary to depart from the findings of the hearing officer without explanation was arbitrary and capricious. *Id.* ¶¶ 1, 13–14. We noted that "[w]hen the Legislature specifically directs the Secretary to state the reasons for an administrative action, the reviewing court 'may not supply a reasoned basis for the agency's action that the agency itself has not given.' " *Id.* ¶ 20 (quoting *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)).

{20} At the end of the hearing in our case, the hearing officer asked the participants to answer a series of questions regarding the hearing officer's ability to design a remedy based on the input of all of the participants. The hearing officer did not address those points in her proposed findings of fact and conclusions of law. Citizen Action now argues that because the hearing officer had questions at the hearing about the limits of her discretion to create a remedy, she was required by *Atlixco* to "supply a reasoned basis for the" remedy selected. 1998–NMCA–134, ¶ 20, 125 N.M. 786, 965 P.2d 370 (internal quotation marks and citation omitted). We find *Atlixco* to be inapplicable. The core issue of *Atlixco* was that the Secretary departed from the findings of the hearing officer without explanation. *Id.* ¶¶ 2, 13, 21–22. The Secretary in the present case accepted the findings of the hearing officer with only a few exceptions, which are not relevant to this discussion, and thus supplied "a reasoned basis for the agency's action." *Id.* ¶ 20 (internal quotation marks and citation omitted).

{21} Even if *Atlixco* were applicable, the hearing officer cited to particular testimony upon which her findings were based. Citizen Action specifically challenges finding 148: "NMED, however, demonstrated that the requirements it demanded for the landfill remedy were technically equivalent to those [Citizen Action] urged it to enforce"; Citizen Action argues that there is no explanation for how the hearing officer determined the remedies were "technically equivalent." The

hearing officer, in that finding, directed the reader's attention to the testimony of Moats; he testified that "[w]hile the two regulatory approaches have some differences, the technical requirements are essentially the same for both." Moats continued to explain the requirements of the remedies for several pages of the hearing transcript. Viewing the hearing officer's finding in the light of the whole record, we hold that the finding was not unreasonable or without rational basis. *See Rio Grande Chapter of the Sierra Club*, 2003–NMSC–005, ¶ 17, 133 N.M. 97, 61 P.3d 806.

█ {22} Citizen Action also asserts that the Secretary arbitrarily relied on an incomplete record regarding the waste inventory provided by Sandia. This argument is without merit. The hearing officer's report acknowledged that "[g]iven the length of time this landfill has been documented and studied, it makes sense that not all documentation is accurate." The hearing officer was "troubled" by one study, which suggested that NMED conducted only a cursory review of records to conclude that "the classified records were sound and Sandia knew how much of what went into the landfill over time." However, the hearing officer determined that "NMED's testimony [was] credible" on the subject, and "for the most part[, she] was impressed with the detailed efforts and studies from both Sandia and NMED showing that high-level radioactive waste was not buried at the landfill." Though she noted that there was a "significant amount of controversy surrounding the inventory raised by Citizen Action's witnesses, the WERC panel and the public," the hearing officer ultimately concluded that "in spite of this, based on NMED's and Sandia's testimony, [she] had to agree that there is a reasonably accurate and complete inventory for the landfill, and that more is known about this landfill than about many other historic landfills."

{23} This conclusion is represented by finding 45:

> The waste inventory is unlikely to be complete or completely accurate. However, it is reasonably complete and accurate considering the age of the records, length of time the landfill operated, and the types of wastes routinely disposed of in the landfill. Most older landfills operating during the

same time period have no disposal records or incomplete disposal records.

Based on a review of the whole record, we can find no indication that the decision to rely upon the waste inventory was either unreasonable or irrational. The hearing officer clearly weighed the testimony presented about the waste inventory, and she came to a conclusion that the inventory was sufficient. The Secretary, as permitted by NMED's regulations, adopted the hearing officer's findings with minor alterations not relevant to the issues in this appeal. *See* Post Hearing Procedures, New Mexico Environment Department, 20.1.4.500(D)(2) NMAC ("The Secretary may adopt, modify, or set aside the Hearing Officer's recommended decision, and shall set forth in the final order the reasons for the action taken."). We find no error here.

## 2. Findings 101 and 133

█ {24} Citizen Action challenges findings 101 and 133. "We review an agency's findings by examining the entire record, but we must affirm a decision if it is supported by substantial evidence." *Selmeczki*, 2006–NMCA–024, ¶ 15, 139 N.M. 122, 129 P.3d 158. In finding 101, the hearing officer stated, "Any remedy that is protective of human health and the environment may be selected; Sandia is not required to select the most protective remedy." In support of this finding, the hearing officer referenced the testimony of Moats, who used this same terminology when outlining the different remedy options. We observe that this same language is found in Section 74–4–4.2(C), which governs the issuance and modification of permits. *Id.* ("[T]he secretary may issue . . . a permit subject to any conditions necessary to protect human health and the environment[.]").

█ {25} Finding 133 notes that the hearing officer heard testimony that "[a fate and transport] model could be useful at any stage of work on the landfill, and could assist in identifying future action levels or triggers." Citizen Action maintains that a fate and transport model is not a useful tool if it is used after the final remedy has been selected, since the purpose of the model is to

provide information that is useful in selecting a remedy. The hearing officer heard testimony about the benefits of a fate and transport model and then concluded that the model should be used to evaluate future options, triggers, monitoring, and conditions. Both findings 101 and 133 are supported by substantial evidence, and we will not disturb those findings.

## C. Failure to Address Evidentiary Issues

{26} Citizen Action also contends that the hearing officer's report does not refer to or incorporate specific evidence that Citizen Action provided regarding (1) transuranic waste, (2) waste that is greater than Class C level, and (3) volatile organics. Citizen Action again attempts to apply *Atlixco* in order to require the Secretary to explain why he did not consider this particular evidence. We again find *Atlixco* inapplicable. There is no evidence that the Secretary departed from the hearing officer's findings. Instead, the Secretary adopted all of the hearing officer's findings with regard to these issues.

{27} The hearing officer's report does not explicitly address "[t]ransuranic waste" or "[g]reater than Class C level waste." Both NMED's and Sandia's briefs refer to these two specific topics generally—as "radioactive" material. The proposed findings of fact did discuss radioactive waste in findings 46–50, particularly nuclear fuel canisters, to which Citizen Action refers as "[g]reater than Class C level waste." Additionally, the hearing officer addressed radioactive material in the following factual findings: 30, 58, 90, 112, 117, 119–121, and 152. Citizen Action's argument that the hearing officer and the Secretary did not consider evidence of radioactive materials is not persuasive.

{28} We point out that Citizen Action cites no authority to suggest that the hearing officer acts arbitrarily and capriciously if she does not address each point raised by a party at a hearing or in a recommendation. *See Pickett Ranch*, 2006–NMCA–082, ¶¶ 51–52, 140 N.M. 49, 139 P.3d 209. "In the absence of authority supporting [the a]ppellant's position, we will not presume error on the part of the Secretary." *Id.* ¶ 53, 139 P.3d 209.

{29} Citizen Action also refers us to conclusion of law K and argues that it represents a misunderstanding about the Secretary's jurisdiction to consider radioactive materials and should therefore be reviewed de novo. We disagree. In order to implement the remedy that NMED selected after the Study was conducted, Sandia, NMED, and DOE entered into a compliance order (Consent Order), pursuant to Section 74–4–10(A)(1). Conclusion K refers to the Consent Order and states, "The requirements of the Consent Order apply to hazardous waste and the hazardous waste component of mixed waste." There is no indication in this conclusion that the Secretary believes his jurisdiction to consider radioactive materials is limited. Conclusion L continues the reasoning: "The Consent Order does not apply to radionuclides, including but not limited to source, special nuclear, or byproduct material as defined in the Atomic Energy Act of 1954, or the radioactive portion of mixed waste." The limitations of the Consent Order are not a jurisdictional limitation on the Secretary. The Secretary, in these quoted conclusions, merely stated that the Consent Order so defined the limits of this particular inquiry. We will not create jurisdictional confusion where none existed.

{30} With regard to volatile organics, the Secretary relied entirely on the findings of the hearing officer. Findings 63–66 explicitly discuss volatile organics. The hearing officer concluded in finding 72 that the volatile organics "pose [an] insignificant risk to human health."

## D. Extent of Authority

{31} Citizen Action further argues that the hearing officer was confused about the extent of her authority, as indicated by the comments at the end of the hearing, and that she felt constrained to choose only between the remedies presented by Sandia and NMED and not the other parties that presented testimony. There is no evidence in the record to support this theory. The hearing officer recommended the following remedy, in relevant part:

1. The remedy shall be a vegetative cover with bio-intrusion barrier[.]

2. As part of the Corrective Measures Implementation Plan that incorporates the final remedy (described in the draft permit

modification in Paragraph V.3), Sandia shall additionally include the following:

    a.  a comprehensive fate and transport model that studies and predicts future movement of contaminants in the landfill and whether they will eventually move f[a]rther down the vadose zone and/or to groundwater;

    b.  triggers for future action, [which] identify and detail specific monitoring results that will require additional testing or the implementation of an additional or different remedy.

    . . . .

    5.  Sandia shall prepare a report every 5 years, re-evaluating the feasibility of excavation and analyzing the continued effectiveness of the selected remedy.

{32} This proposed remedy was, in fact, a combination of suggestions from various interested parties. An independent panel recommended a fate and transport model to the hearing officer; both NMED and Sandia argued against including a fate and transport model as part of the remedy for the MWL. The hearing officer, on her own initiative, required Sandia to submit a report every five years in order to facilitate reevaluation of the feasibility of excavation. There is no indication that the hearing officer felt she could not compose a unique remedy based on the suggestions proffered at the hearing. Despite the hearing officer's comments regarding her ability to craft a creative remedy, which were made at the close of the hearing, the ultimate recommendation to the Secretary was based on the testimony taken and the evidence received at the hearing. *See Grogan v. N.M. Taxation & Revenue Dep't*, 2003-NMCA-033, ¶ 35, 133 N.M. 354, 62 P.3d 1236 ("[D]espite the verbal comments at the hearing, the hearing officer's determination of negligence was supported by substantial evidence.").

{33} Furthermore, Citizen Action does not argue that the hearing officer acted outside her authority when she constructed the remedy that was ultimately adopted by the Secretary. When considering modifications to permits, the hearing officer must consider input from "interested persons." Section 74-4-4.2(H) ("No ruling shall be made on permit issuance, major modification, suspension or revocation without an opportunity for a public hearing at which all interested persons shall be given a reasonable chance to submit data, views or arguments orally or in writing and to examine witnesses testifying at the hearing[.]"). It is evident from the record that the hearing officer considered recommendations from interested persons: during a four-day public hearing in 2004, the hearing officer considered the testimony of approximately 30 people and read more than 350 postcards.

{34} Citizen Action claims that the hearing officer did not consider its remedy or that recommended by the independent panel "on an even playing field." The evidence supports the opposite conclusion. For more than thirty pages, the hearing officer's report outlines the testimony of each interested party and weighs its credibility. In some circumstances, the hearing officer found that the testimony of Citizen Action's witnesses was more credible than that of other organizations' witnesses: "Citizen Action presented a convincing argument that Sandia had over[ ]estimated the costs of excavation[.]" The hearing officer was required to find some testimony more persuasive than other testimony; we cannot conclude that the hearing officer did not consider all of the testimony simply because in the end, she had to choose a position and formulate a conclusion. *See Pickett Ranch*, 2006-NMCA-082, ¶ 57, 140 N.M. 49, 139 P.3d 209 ("[G]iven the hearing officer's explicit statement that she reviewed [the a]ppellant's proposed conditions, we conclude that the officer properly considered all of the proposed conditions and adopted only those that she thought were necessary to protect the public and the environment.").

**E.  Response to Public Comments**

    {35} Citizen Action next argues that the order of the Secretary must be set aside because NMED did not sufficiently consider public comment prior to issuing the final decision. The New Mexico Administrative Code requires the following: "No ruling shall be made on permit issuance or denial without an opportunity for a public hearing, at which all interested persons shall be given a reasonable chance to submit significant data, views or arguments orally or in writing and

to examine witnesses testifying at the public hearing." 20.4.1.901(A)(5) NMAC. The Code also dictates, "At the time that any final permit decision is issued, the Secretary shall issue a response to comments." 20.4.1.901(A)(9) NMAC. Citizen Action contends that because the Secretary did not respond to comments from the public until after he issued the final decision, public participation in the permit process was made irrelevant. We disagree.

{36} Citizen Action confuses the requirement for consideration of public comments with the requirement for a written response to the comments. As we have repeatedly stated in preceding paragraphs, the hearing officer carefully considered the public's comments and incorporated some of those comments into the ultimate remedy. There is no evidence that the hearing officer and the Secretary did not "give due consideration and the weight he/she deems appropriate to all comments received during a public comment period and to all relevant facts and circumstances presented at a public hearing." 20.4.1.901(A)(7) NMAC. Simply because the Secretary did not provide a written response to the submitted public comments before issuing the final order does not mean that the Secretary did not consider the public input when drafting the order.

{37} Citizen Action also challenges the method of evaluating the remedy implemented. In NMED's response to the hearing officer's report, NMED objected to the suggestion that NMED should be required to respond to public comment on progress reports issued by the United States Department of Energy regarding implementation of the remedy. NMED argued that the progress reports "will not be further modified, approved or finalized by NMED as a result of public comment." Citizen Action characterizes this objection as "ma[king] clear early on that entry of a final order made public participation in any ongoing review of the fate and transport model legally irrelevant." We do not agree that the public will have no part in the review of the efficacy of the fate and transport model.

{38} The objection by NMED merely pointed out that the agency should not have to respond to public comment regarding a report that NMED did not issue and could not change. Actually, the Secretary's order greatly expands public participation in the future review of the MWL. Finding 171 states the following:

As several components of the selected remedy remain to be developed, it is important that the public continue to have access to information and to participate in future decisions regarding the landfill. Many members of the public who commented at the hearing encouraged NMED to require that Sandia provide convenient public access to monitoring data, major documents, and other significant information.

(Citation omitted.) In addition to establishing this finding, the hearing officer proposed, and the Secretary accepted, that the order include the following language:

3. NMED and Sandia shall provide a convenient method for the public to review Sandia's Corrective Measures Implementation Plan, Corrective Measures Implementation Report, progress reports, long-term monitoring and maintenance plan, and any other major documents developed by NMED or Sandia for the MWL ("the documents"), including but not limited to[ ] posting the documents on a publicly[ ]accessible website.

4. NMED and Sandia shall provide a method and schedule that allows interested members of the public to review and comment on the documents, and NMED shall review, consider and respond to these public comments prior to approving any of these documents[.]

5. Sandia shall prepare a report every 5 years, re-evaluating the feasibility of excavation and analyzing the continued effectiveness of the selected remedy.... Sandia shall make the report and supporting information readily available to the public, before it is approved by NMED. NMED shall provide a process whereby members of the public may comment on the report and its conclusions, and shall respond to those comments in its final approval of the report.

The public has not been shut out of the decision-making; nor have public comments been made legally irrelevant. Instead, the

Secretary's remedy includes additional provisions to ensure that the public will remain involved in the future remedy for the MWL.

## III. CONCLUSION

{39} We affirm the Secretary's order granting permit modifications to allow for corrective measures for the MWL at Sandia.

{40} **IT IS SO ORDERED.**

WE CONCUR: MICHAEL D. BUSTAMANTE and RODERICK T. KENNEDY, Judges.